Herbert SCHOENBROD, as Trustee, etc.

v.

The UNITED STATES.

No. 91–67.

United States Court of Claims.

May 16, 1969.

Joseph Stein, attorney of record, for plaintiffs.

Stephen M. Joynt, Bladensburg, Md., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT

DURFEE, Judge.

On June 20, 1962, the Department of the Interior issued an Invitation for Proposals for processing and selling Alaska sealskins for the account of the United States. Eighty firms were solicited and raw skins were furnished to eleven of them for sample processing. Five proposals were submitted.

The samples which were submitted were subjected to a series of inspections and tests. While this was going on, discussions were being held with the participating firms, concerning the nature and character of the services, the production desired, and the financial responsibility and technical facilities of the respective firms. No discussions were held at that time relating to price. On March 1, 1963, it was determined that negotiations be conducted with five firms, with the view to the execution of a contract with one of them. The firms were ranked, and negotiations were conducted according to this order of priority.

In conformity with this procedure, negotiations were held with Supara, Inc., which had been ranked first. For the first time, price was discussed, and a contract was entered into on March 14, 1963.

As a result of the awarding of the contract to Supara, Inc., protests were filed on behalf of the two leading competitors, Pierre Laclede Fur Company and Fouke Fur Company. Their principal complaints were the failure of the Department of the Interior to call for the inclusion of pricing factors in the initial proposals and its failure to consider pricing

aspects of the proposals of all contenders competitively.

These protests were submitted to the Department of the Interior and to the Comptroller General. The latter issued his decision on October 10, 1963, which invalidated the awarding of the contract because the Department was without authority to negotiate the contract without soliciting firm proposals from all responsible offerors, including price considerations. 43 Comp.Gen. 353. After the contract was rescinded and new bids were announced, Fouke Fur Company was awarded the contract.

Plaintiffs are claiming that the cancellation of the award is a breach of contract. The basic issue is whether Federal Procurement Regulations were contravened in the awarding of the contract. Both sides have moved for summary judgment.

The contract at issue was awarded under the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 471 et seq., as amended (1964). The Federal Procurement Regulations, in effect at the time this alleged contract was awarded, state that they are "prescribed by the Administrator of General Services under the Federal Property and Administrative Services Act of 1949, * * *." 41 C.F.R. § 1–1.003 (1963 ed.) [1] A careful study of these regulations, as well as the Interior Department's guidelines implementing them, shows that the procedures employed here were not those which were required.

General policies for public contracts are set forth in 41 C.F.R., Subpart 1–1.3. Section 1–1.301 states:

Methods of procurement.

It shall be the objective to use that method of procurement which will be most advantageous to the Government —price, quality, and other factors considered. Procurement shall be made on a competitive basis, whether by formal advertising or by negotiation,

to the maximum practical extent, in accordance with the policies and procedures set forth in this chapter. *Procurement shall be effected by advertising for bids and thereafter awarding a contract to the lowest responsible bidder, except that when authorized procurement may be effected by negotiation in accordance with Part 1–3 of this chapter.* [Emphasis supplied]

Thus, in general, price is a factor to be considered. Part 1–3 of 41 C.F.R. deals with "Procurement by Negotiation." Even when procurement is effected by this method, price is still an important factor. Section 1–3.102 states:

Factors to be considered in negotiated contracts.

Whenever property or services are to be procured by negotiation, offers shall be solicited from all such qualified sources as are deemed necessary by the contracting officer to assure full and free competition, consistent with the procurement of the required property or services, in accordance with the basic policies set forth in this Part 1–3, to the end that the procurement will be made to the best advantage of the Government, *price and other factors considered.* * * * Negotiation shall thereupon be conducted with due attention being given to the following, and any other appropriate factors:

(a) *Comparison of prices quoted and consideration of other prices for the same or similar property or services,* * * *. [Emphasis supplied]

The provisions of Title III of the Federal Property and Administrative Services Act of 1949 and the Federal Procurement Regulations were adopted by the Department of the Interior to govern the procurement of personal property and nonpersonal services, "unless an exception is made by the Secretary for any purchase or class of purchases, * * *." 41 C.F.R. § 14–1.102. By virtue of this adoption, the element of pricing intended to be considered by the Federal Procure-

---

1. References to the Code of Federal Regulations will hereinafter refer to the 1963 edition, which was in effect at the time of the events described.

ment Regulations was also intended to be considered by the Department.

The importance of considering price as an element for consideration is borne out by the Department of the Interior Departmental Manual. Subpart 404.1 states:

7. *Procedures.*

A. *Contracts for Other than Professions Architectural or Engineering Services.*

(1) *Solicitation.* Whenever a contract (other than a contract for professional architectural or engineering services) is to be negotiated, price quotations and all other necessary information shall be solicited from such qualified sources as are deemed necessary by the contracting officer to assume adequate competition. * * *

\* \* \* \* \* \*

(3) *Considerations Governing Awards.* It is the responsibility of the contracting officer conducting negotiations to give consideration to the following and any other applicable factors:

\* \* \* \* \* \*

(c) Prices quoted, and consideration of other prices for the same or similar supplies or services, with due regard to cost of transportation, cash discounts, and any other factors relating to prices.

Plaintiffs contend that their services were unique, and that they were therefore exempt from the general rules governing negotiated contracts. 41 C.F.R. § 1–3.805(a) (2) provides that when negotiations are being conducted with several offerors, all of the offerors shall be given an opportunity to submit pricing revisions in their proposals as may result from the negotiations. Sec. 1–3.805(d) says that the procedures in subparagraphs (a), (b) and (c) of § 1–3.805 "may not be applicable in appropriate cases when procuring research and development, or *special services* (such as architect-engineer services) or when cost-

reimbursement type contracting is anticipated." [Emphasis supplied.]

Plaintiffs' contract is clearly not one for research and development, nor is it a cost-reimbursement contract. Although plaintiffs argue that their services were "special," we believe that the Regulation contemplates professional services in which bidding on the basis of price is considered unethical. This is exemplified by the Interior Departmental Manual, Subpart 404.1.7.A, *supra*, which mandates price quotations for contracts "Other than Professional Architectural or Engineering Services."

Since plaintiffs' services were clearly not "professional" or "special," they should have been governed by 41 C.F.R. § 1–3.805(a) (2). Thus, the use of procedures consonant with those to be afforded professionals (as spelled out in Subpart 404.1.7.B of the Manual), was a violation of both the Federal Procurement Regulations and the Department of the Interior Manual. In addition, 41 C.F.R. § 1–3.102, relating to solicitation of offers, was not followed.

Our conclusion that applicable regulations were not followed is based not only on a reading of their plain meaning, but also on the clear legislative intent embodied in them.

The House and Senate Reports on the Federal Property and Administrative Services Act, *supra*, contain identical language concerning the procurement principles sought to be established. They state:

Title III extends to the General Services Agency the principles of the Armed Services Procurement Act of 1947, * * *. H.Rept. No. 670, 81st Cong., 1st Sess. (1949) p. 6 and S.Rept. No. 475, 81st Cong., 1st Sess. (1949) p. 5, U.S.Code Cong.Serv. 1949, pp. 1475, 1479.

The Armed Services Procurement Act of 1947, ch. 65, § 2, 62 Stat. 21, as recodified in 41 U.S.C. ch. 3 (1964), was finally passed after deleting authority to negotiate contracts for the purpose of securing a particular quality of goods, in

order to prevent possible administrative abuse. S.Report No. 571, 80th Cong., 1st Sess. (1947) p. 3. This deletion occurred despite the plea of the Assistant Secretary of the Navy for such authority, who believed that the quality of military procurement should not be compromised by mandatory considerations of price.

If price considerations were considered important in the area of military and defense procurement, where quality and reliability are of great importance, it would seem strange indeed that the competitive aspect of pricing should not be applicable in the procurement of sealskins.

In Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963), the Supreme Court examined 10 U.S.C. § 2305(c), the recodification (without substantial change) of the Armed Services Procurement Act of 1947, and the Regulation under it. Since Title III of the Federal Property and Administrative Services Act extended the principles of the Armed Services Procurement Act to the General Services Agency, it is of more than passing interest to note what the Court said there with respect to the policy underlying the Regulation:

The Armed Services Procurement Regulation speaks in unambiguous terms of a policy "to use that method of procurement which will be most advantageous to the Government—price, quality, and other factors considered." The Regulation states, "Such procurement shall be made on a competitive basis, whether by formal advertising or by negotiation, to the maximum practicable extent * * *." Whatever method is used—formal advertising or negotiation—"competitive proposals" must be "solicited from all such qualified sources of supplies or services as are deemed necessary by the contracting officer to assure such full and free competition as * * * to obtain for the Government the most advantageous contract—price, quality, and other factors considered." If advertising for bids is used, the contract is to be awarded "to the lowest responsible bidder." Moreover, even when advertising for bids is not used, competitive standards are not relaxed. The policy is "to procure supplies and services from responsible sources at fair and reasonable prices calculated to result in the lowest ultimate over-all cost to the Government." "The fact that a procurement is to be negotiated does not relax the requirements for competition." "Whenever supplies * * * are to be procured by negotiation, price quotations * * * shall be solicited from all such qualified sources of supplies or services as are deemed necessary * * * to assure full and free competition to the end that the procurement will be made to the best advantage of the Government, price and other factors considered." The Regulation then specifies 20 separate considerations for the selection of a supplier in case of a negotiated procurement. The first of these is a "comparison of prices quoted." [citations to the Regulation are omitted] Id. at 252–253, 83 S.Ct. at 431.

The emphasis on competition in the Armed Services Procurement Regulation, and on price as one of the major—if not the most important—competitive factor, is apparent from the foregoing quotation. The Federal Procurement Regulations are almost word for word the same as the ASPR, and as has already been mentioned, are but an extension of the ASPR's policies. When both the plain language of the Regulations and the policy inherent in them support the Government's view that proper procedures were not followed, it is difficult to understand how plaintiffs can complain that their contract was valid. This is especially true since "Regulations reasonably adapted to the administration of a Congressional act, and not inconsistent with any statute, have 'the force and effect of law.'" [citing cases] G. L. Christian and Associates v. United States, 320 F.2d 345, 350, 160 Ct.Cl. 58, 65, cert. denied 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963).

404

Having come to the inevitable conclusion that applicable procurement regulations were not followed, we next conclude that there was no breach of contract when defendant rescinded the contract, since it was initially invalid. The contracting officer has only that authority actually conferred by statute or regulation. Prestex Inc. v. United States, 320 F.2d 367, 371, 162 Ct.Cl. 620, 625 (1963); *cf.* Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Furthermore, the Government is not estopped to deny the limitations of his authority. *Prestex Inc., supra.*

It makes no difference that the Department of the Interior had used the procedure employed here in an earlier contract with Fouke. That contract was entered into in 1947, before the enactment of the Federal Property and Administrative Services Act. Moreover, it was not until March 10, 1959, that the Department of the Interior was authorized to utilize the provisions of Title III of the Federal Property and Administrative Services Act of 1949, 24 F.R. 1921 (March 17, 1959), 41 C.F.R. § 14–1.101; it was not until January 26, 1962 that the Department of the Interior actually adopted regulations implementing Title III, 27 F.R. 776 (January 26, 1962), 41 C.F.R. § 14–1.102. Finally, assuming *arguendo* that the Government had erroneously used these same procedures in other procurements, that is no reason to force the Government to use a practice which is forbidden by applicable regulations.

This is a case in which we find the illegality in the award to be plain on the face of the statute and the regulations unlike those cases in whch we gave the contractor the benefit of the doubt because invalidity was not clear and the contrary position was reasonable. See John Reiner & Co. v. United States, 325 F.2d 438, 440, 442, 163 Ct.Cl. 381, 386— 389 (1963), cert. denied 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964); Brown & Son Electric Co. v. United States, 325 F.2d 446, 163 Ct.Cl. 465 (1963); Coastal Cargo Co. v. United States, 351 F.2d 1004, 173 Ct.Cl. 259, (1965); Warren Bros. Roads Co. v. United States, 355 F.2d 612, 173 Ct.Cl. 714 (1965). Where illegality is clear, we have no choice but to hold the award and contract to be invalid.

Since the Department of the Interior's regulations, based on the Federal Procurement Regulations mandated by the Federal Property and Administrative Services Act of 1949, were not followed, the contract at issue here was invalid and of no effect. Therefore, the rescinding of the contract was not a breach.

Accordingly, defendant's motion for summary judgment is granted, plaintiffs' cross motion is denied, and the case is dismissed.