**AMERICAN SCIENCE AND ENGINEERING, INC.**

v.

**The UNITED STATES.**

No. 133–78.

United States Court of Claims.

Oct. 21, 1981.

Edward J. Barshak, Boston, Mass., attorney of record, for plaintiff. Jeffrey S. Stern and Regina E. Roman, Boston, Mass., of counsel.

John Fargo, Washington, D. C., with whom was Asst. Atty. Gen., Thomas S. Martin, Washington, D. C., for defendánt. Vito J. DiPietro and Barry N. Walker, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and KUNZIG and BENNETT, Judges.

KUNZIG, Judge:

This government contracts case comes before the court on plaintiff's motion for partial summary judgment on Count I of its petition and defendant's cross-motion for summary judgment. In its Count I, plaintiff contends that the Government has wrongfully cancelled a license agreement entered into by the parties which granted plaintiff a waiver of foreign rights and an exclusive three-year license to market a revolutionary Computerized Tomographic Scanner ("CT Scanner") in the United States. The CT Scanner, known as a circle array tomography system, had been developed and built by the plaintiff pursuant to a research and development contract entered into between plaintiff and the National Cancer Institute of the Department of Health, Education and Welfare ("HEW"). The government, in turn, defends on the ground that both the exclusive license and the waiver were void *ab initio* and therefore cannot give rise to governmental liability. We reject the government's position, and consequently, grant plaintiff's motion for partial summary judgment and deny defendant's motion for summary judgment. Plaintiff is awarded judgment on the issue of liability on its Count I.

## I. Background

Each year the government contributes substantial sums to a wide range of research and development ("R&D") projects undertaken in the private sector.[1] For a given R&D project, basic matters such as the size of the government's contribution and a description of the work to be performed are governed by contract. Similarly, the patent rights to inventions made during the course of performance of a government R&D contract are determined by the patent rights clauses contained in the R&D contract.[2]

Federal agencies are authorized to grant exclusive licenses to contractors who develop subject inventions in the course of performing R&D contracts.[3] A Presidential

---

1. The government spent over two and one-half billion dollars on R&D in the health field during fiscal year 1977. That figure is expected to increase to slightly over three and three-quarter billion dollars during fiscal year 1981. STATISTICAL ABSTRACT OF THE UNITED STATES 625 (1980).

2. The procedures for determining the appropriate patent rights clause to be included in a particular R&D contract are set forth at 41 C.F.R. § 1–9.107–4 (1980). The regulation dictates that the agency ascertain whether the contractor is an industrial concern or a non-profit organization, and whether the work is developmental or calls for basic or applied research. The full panoply of patent rights clauses appears at 41 C.F.R. §§ 1–9.107–5 to –6. The C.F.R. sections cited herein to the 1980 revisions are virtually identical to those in effect in 1976–77.

3. It has been noted that "[o]ne of the ordinary methods of transferring an interest in a patent is by license, which is any right to make, use, or sell the patented invention which *is* less than an undivided part interest in the patent itself." 69 C.J.S. *Patents* § 242 (1951). *See generally* B. Brunsvold and D. O'Reilley, THE LAW AND BUSINESS OF PATENT KNOW-HOW LICENSING B–1 (5th ed. 1981); S. Fuscher, *A Study of How the Government Obtains Patent*

Statement of Government Patent Policy[4] and Federal Procurement Regulations ("FPRs")[5] based thereon have been promulgated to govern the issuance of these licenses. The government's grant of exclusive licenses in the public health field is designed to promote the expeditious development of medical technologies so that the public can benefit from their early civilian use.[6]

## II. History of the AS&E License Agreement

Prior to 1975 the plaintiff, American Science and Engineering, Inc., ("AS&E"), conceived certain inventions for improved CT Scanners. On or about June 30, 1975, AS&E and the National Cancer Institute of HEW entered into a R&D contract under which AS&E developed and built a CT Scanner incorporating the inventions and "reducing them to practice."[7] Significantly, the research contract in question provided that the Secretary of HEW, or his duly authorized representative, had the "sole and exclusive power . . . to determine the disposition of all rights in any inventions made under this contract, including title to and rights under any patent application or patent which may issue thereon."[8]

In a letter dated July 14, 1976, AS&E reported two inventions, the circle array tomography system and another related invention, to the contracting officer and requested an exclusive license under each invention. HEW, acting through its patent counsel, responded by sending to AS&E a specimen license agreement and a set of instructions concerning the applicable procedures to be followed by a license appli-

---

*Rights Under the DAR and FPR Patent Rights Clauses*, 10 PUB.CONT.L.J. 296 (1978).

The provisions regarding the criteria to be utilized in granting an exclusive license have been significantly modified by recent act of Congress. *See* Act to Amend the Patent and Trademark Laws, Pub.L. No. 96–517, 94 Stat. 3015 (1980) (to be codified in scattered sections of U.S.C.). 35 U.S.C. § 209 will provide in part:

(c)(1) Each Federal agency may grant exclusive or partially exclusive licenses in any invention covered by a federally owned domestic patent or patent application only if, after public notice and opportunity for filing written objections, it is determined that—

(A) the interests of the Federal Government and the public will best be served by the proposed license, in view of the applicant's intentions, plans, and ability to bring the invention to practical application or otherwise promote the invention's utilization by the public;

(B) the desired practical application has not been achieved, or is not likely expeditiously to be achieved, under any nonexclusive license which has been granted, or which may be granted, on the invention;

(C) exclusive or partially exclusive licensing is a reasonable and necessary incentive to call forth the investment of risk capital and expenditures to bring the invention to practical application or otherwise promote the invention's utilization by the public; and

(D) the proposed terms and scope of exclusivity are not greater than reasonably necessary to provide the incentive for bringing the invention to practical application or otherwise promote the invention's utilization by the public.

The statute quoted above was approved on December 12, 1980, and does not affect the 1977 license agreement at issue in this case.

4. 36 Fed.Reg. 16,887 (1971).

5. 41 C.F.R. §§ 1–9.100 to 109–7 (1980).

6. *Id.* § 1–9.107.1.

7. The phrase "reduction to practice" is a term of art peculiar to patent law and is used to determine priority among competing parties for a particular patent. *See* S. Fuscher, *A Study of How the Government Obtains Patent Rights Under the DAR and FPR Patent Rights Clauses*, 10 PUB.CONT.L.J. 296, 298 (1978). There is no dispute between the parties in this case as to whether the inventions were conceived and reduced to practice prior to the execution of the R&D contract. *But see Technitrol, Inc. v. United States*, 194 Ct.Cl. 596, 440 F.2d 1362 (1971); *Mine Safety Appliances Co. v. United States*, 176 Ct.Cl. 777, 364 F.2d 385 (1966).

8. In September of 1976 AS&E filed at its own expense United States patent applications on the inventions, with HEW's knowledge and concurrence. In February of 1978 the United States Patent and Trademark Office declared an interference between the AS&E application on the circular array tomography system and a competing application owned by EMI, Ltd. This interference proceeding was still ongoing at the time this court heard oral argument in the present case. Resolution of the interference proceeding has no bearing on the issue of liability for breach of contract, but may be a factor in any subsequent determination as to damages.

cant. In accordance with these instructions, on or about September 17, 1976, the plaintiff submitted a petition to HEW requesting an exclusive license to practice the inventions in the United States, and shortly thereafter, AS&E requested the retention of all foreign rights to the inventions.

HEW accordingly reviewed plaintiff's petition for an exclusive domestic license and request for the retention of foreign rights in the inventions. This review process included four separate governmental entities: the National Institutes of Health ("NIH"), the National Cancer Institute, the Office of the Assistant Secretary for Health of HEW, and the HEW Patent Branch. Subsequent to this review, the HEW Patent Counsel sent a letter to the office of the Assistant Secretary for Health summarizing the review process and recommending that AS&E be granted an exclusive domestic license for a five-year period. Because a change in administrations at the White House was imminent, the matter was referred by the outgoing Assistant Secretary of Health to the Acting Assistant Secretary of Health, Dr. James F. Dickson, for final action. Shortly after taking office, Dr. Dickson signed a determination of rights letter which waived all foreign rights to AS&E and granted its application for an exclusive U.S. license for a period of five years. The determination letter was dated January 21, 1977, and read in part:

> In considering this request, the case has been thoroughly reviewed to determine if the granting of a limited exclusive license would result in the invention being more adequately and quickly accepted by the scientific community for the widest use

by the general public. Consistent with the above cited regulations, and the "Greater Rights" provision of the President's Statement on Government Patent Policy of August 23, 1971, it is my determination that the public interest will be best served by the granting of a limited exclusive license to American Science and Engineering. . . .

Additionally, a formal license agreement was incorporated by reference in the letter. AS&E was instructed to indicate its acceptance of the determination by signing a copy of the letter, signing two copies of the license agreement, and returning those materials to HEW with assignments of the domestic patent rights. AS&E complied with these instructions on January 28, 1977.

HEW's formal execution of the license agreement was delayed as a result of a letter by a National Cancer Institute staff member which was critical of the exclusive license arrangement. In response to this letter a second evaluation of the exclusive license agreement was undertaken, a process which extended over a five month period and included consideration of extensive additional information.[9] The net result of this second exhaustive review was a unanimous recommendation from the National Institutes of Health Inventions and Patents Board to grant the exclusive license to AS&E, but to reduce the term of the license from five to three years. This recommendation, along with a detailed briefing memorandum prepared by HEW's Patent Counsel, was forwarded to Dr. Dickson as Acting Assistant Secretary for Health. Dr. Dickson again determined that a limited exclu-

9. Incident to this second review, notice of intent to grant the license was published in the Federal Register, inviting public comment and applications for licenses to practice the two inventions. See 42 Fed.Reg. 18,451 (1977). The publication of notice was not required by any applicable regulation. Seven of AS&E's competitors responded to the notice; each of their submissions was considered by the National Institutes of Health Inventions and Patents Board. As regards six of the submissions, the Inventions and Patents Board concluded that the development and practical application of the inventions was speculative and indefi-

nite. The application of Ohio Nuclear, Inc. was considered at length but ultimately rejected by the Board because of its dominant position in the CT Scanner market and evidence that its "new generation" scanner utilized technology derived from AS&E. AS&E had previously provided the Board with a detailed plan for the development of the two subject inventions, and had made a strong showing that the exclusive license was necessary for AS&E, a small business concern, to continue to compete and invest corporate resources in the CT Scanner market.

sive U.S. license be granted to AS&E. A copy of the amended license agreement dated June 17, 1977 was executed on behalf of HEW and sent to AS&E. AS&E accordingly pressed forward with the development of its CT Scanner.

On July 13, 1977, President Carter's newly appointed Assistant Secretary of Health, Dr. Julius Richmond, replaced Acting Assistant Secretary Dickson and assumed office. Eight days later, Dr. Richmond sent a letter to AS&E summarily cancelling both the U.S. license agreement and the retention of foreign rights, effective immediately. The alleged ground for cancelling the three-year license agreement was that it was granted without authority and in violation of the Federal Procurement Regulations.[10] Dr. Richmond's decision was apparently based upon oral advice received from the general counsel of HEW and his deputy.[11] No additional fact-finding was undertaken prior to the purported cancellation, nor was AS&E given notice of HEW's review of Dr. Dickson's original determination.

On July 27, 1977, AS&E filed suit in U.S. District Court for the District of Massachusetts. Although the trial court issued a preliminary injunction enjoining HEW from proceeding with the cancellation, the United States Court of Appeals for the First Circuit held that the district court lacked subject matter jurisdiction and remanded the cause with directions that it be transferred to the Court of Claims.

### III. Analysis

The validity of the license agreement entered into between AS&E and HEW must initially be determined according to general principles of contract law. 69 C.J.S. *Patents* § 244 (1951). The contractual requirements of offer, acceptance, and consideration are not disputed by the parties. Although HEW delayed execution of the licensing agreement for almost six months after Dickson's initial determination awarding AS&E a five-year license, the three-year agreement was formally executed by HEW on June 17, 1977. After this time both parties were ostensibly bound by the terms of the contract, which imposed obligations and conferred rights upon both AS&E and HEW.

AS&E argues that the license agreement was granted in conformance with all applicable federal regulations, and that an ample factual basis existed in the record for the licensing determinations by the Acting Assistant Secretary, the HEW Patent Counsel, the National Cancer Institute, and the NIH Inventions and Patents Board. Based on this reasoning, AS&E urges this court to find that the government's purported cancellation of the license agreement constitutes a breach of contract. The govern-

10. Dr. Richmond's purported cancellation of the licensing agreement was not based upon the revocation clause contained in the license agreement (clause 12), which provided that the license could be revoked upon a determination "that the public health, safety or welfare requires such action." As with the pending patent interference proceeding, this revocation clause does not affect our determination as to liability for breach of contract but should be considered in formulating a damages award. *See, e. g., John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 393, 325 F.2d 438, 444 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964).

11. Dr. Richmond's decision may also have been prompted by a memorandum from Joseph Califano, then serving as Secretary of HEW, in which Califano notified Dr. Richmond that he had asked the HEW Inspector General to review the decision process which led to the grant of the AS&E exclusive license. Califano's memorandum was dated July 21, 1977, the same date that Dr. Richmond wrote his letter to AS&E purporting to cancel the license agreement. In his memorandum, Califano stated, "In view of my general concern with respect to the contract procurement process within the Department, I am interested in knowing how this decision was made." This language is difficult to reconcile with that which appeared in a letter Califano had written to the Speaker of the House, Thomas (Tip) O'Neill, less than one month earlier. In his letter to the Speaker, Califano stated, "I am pleased to report that the Department has now granted and returned a limited exclusive license under these inventions to AS&E as an incentive toward their commercial development." His letter to the Speaker concluded that "this matter has now been resolved in a manner which is fair and equitable to AS&E, the Department, the public and other manufacturers of CT Scanners."

ment, in turn, argues that HEW failed to comply with the pertinent federal procurement regulation in granting the exclusive domestic license to AS&E, and that this failure rendered the license void *ab initio*. Additionally, the government asserts that HEW's waiver of foreign patent rights was made without the required finding that it was in the public interest,[12] and accordingly, that HEW is not bound by the waiver.

The government correctly points out that the authority for granting an exclusive domestic license to an R&D contractor is governed primarily by 41 C.F.R. § 1–9.107–3(a) (1980), which provides in part:

> Greater rights may also be retained by the contractor after the invention has been identified where the head of the department or agency *determines that the retention of such greater rights is . . . either a necessary incentive to call forth private risk capital and expense to bring the invention to the point of practical application or that the Government's contribution to the invention is small compared to that of the contractor.* (Emphasis added.)

■ It is settled law that the FPRs have the force and effect of law. *American General Leasing, Inc. v. United States*, 218 Ct.Cl. 367, 587 F.2d 54 (1978); *G.L. Christian and Associates v. United States*, 160 Ct.Cl. 58, 320 F.2d 345, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963). Neither of the parties realistically contends that the government's contribution to the development of the CT Scanner was small compared to that of AS&E.[13] Thus, the pivotal issue in this case turns on the first prong of the test set forth in the regulation, *i. e.*, the question is whether there was a determination that the grant of the exclusive domestic license was a necessary incentive to call forth private risk capital and expense to bring the invention to the point of practical application.

The government forcefully argues that AS&E and other companies were in fact already committed to develop a "new generation" CT Scanner to the point of practical application, and therefore that the grant of the exclusive license was *not* a necessary incentive to call forth private risk capital. The government asserts that since HEW did not make a proper determination regarding "private risk capital," HEW therefore exceeded its authority by granting the exclusive domestic license to AS&E. Citing *Alabama Rural Fire Ins. Co. v. United States*, 215 Ct.Cl. 442, 572 F.2d 727, (1978), and *Schoenbrod v. United States*, 187 Ct.Cl. 627, 410 F.2d 400 (1969), the government concludes that the license agreement is a nullity and there can be no liability for its cancellation.

■ The government's argument is defective. It is now settled law that this court will not declare a contract between the government and a private party void *ab initio* unless there was *"plain illegality"* in the contract. *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 386, 325 F.2d 438, 440 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964); *Brown & Son Electric Co. v. United States*, 163 Ct.Cl. 465, 469, 325 F.2d 446, 450 (1963). As this court noted in *Reiner*, "If the contracting officer has viewed the award as lawful, and it is reasonable to take that position under the legislation and regulations, the court should normally follow suit." 163 Ct.Cl. at 386, 325 F.2d at 440.

The applicable regulation, 41 C.F.R. § 1–9.107–3(a), requires only that a *determination* be made that the grant of an exclusive license is a necessary incentive to call forth private risk capital and expense to bring the invention to the point of practical application. In this case such a determination was made by Acting Assistant Secretary of Health Dickson, and there is no

---

12. The regulation which governs the determination of foreign patent rights appears at 41 C.F.R. § 1–9.109–6(g) (1980).

13. Plaintiff argues in a footnote to its brief that the government's contribution to the develop-

ment of the CT Scanner was small compared to AS&E's contribution. We find this argument dubious in light of the fact that the government contributed $1,602,223 toward the design and development of the AS&E Scanner.

indication that such determination was not made in good faith based on substantial evidence in the record,[14] especially as regards the issuance of the license as modified from a five-year to a three-year term. Significantly, language on the face of the license agreement clearly indicates that Dickson was aware of the applicable regulation and made a determination that the grant of the exclusive license was a necessary incentive to call forth private risk capital. The license agreement executed by Dr. Dickson on HEW's behalf on June 17, 1977 contained the following introductory clause:

> [T]he Assistant Secretary for Health has reviewed the request for this license submitted by the licensee and has determined that extensive development and testing requiring substantial investment of private risk capital in the inventions covered by the above patent applications is needed to bring this invention to the point of practical application, and that the granting of this license is consistent with section 8.2(b) of the Department regulations....[15]  (Emphasis added.)

■ Where the language of a contract is unambiguous, contractual terms will be given their usual and ordinary meaning.  S.

W. Aircraft Inc. v. United States, 213 Ct.Cl. 206, 212, 551 F.2d 1208, 1212 (1977);  Selman v. United States, 204 Ct.Cl. 675, 680, 498 F.2d 1354, 1356 (1974);  Guarriello v. United States, 201 Ct.Cl. 129, 134, 475 F.2d 640, 642 (1973);  Dana Corp. v. United States, 200 Ct.Cl. 200, 217, 470 F.2d 1032, 1043 (1972);  Hotpoint Co. v. United States, 127 Ct.Cl. 402, 406, 117 F.Supp. 572, 574, cert. denied, 348 U.S. 820, 75 S.Ct. 32, 99 L.Ed. 647 (1954).  This rule of contractual interpretation is particularly applicable where, as here, the contract language can easily be construed in harmony with the pertinent regulation.  Timber Access Industries Co. v. United States, 213 Ct.Cl. 648, 658, 553 F.2d 1250, 1256 (1977);  Victory Construction Co., Inc. v. United States, 206 Ct.Cl. 274, 287, 510 F.2d 1379, 1386 (1975).

■ The government's second contention, that the waiver of foreign patent rights was made without the required finding that it was in the public interest,[16] is similarly untenable.  The original determination letter to AS&E, dated January 21, 1977, noted that "[t]he material submitted has been evaluated by our scientific and patent staffs to determine how the interests of the

---

**14.** Prior to his decision to grant the exclusive license, Dickson had received a unanimous recommendation from the eight-member NIH Inventions and Patents Board, composed of prestigious physicians and technical experts, that AS&E be granted an exclusive three-year license. This recommendation had been made after a review of the responses by seven of AS&E's competitors to the notice of intent to grant the exclusive license which had been published in the Federal Register.  Dickson had also received a detailed briefing memorandum from the HEW Patent Counsel summarizing the administrative record and explaining the various considerations which played a role in the recommendation to grant the exclusive license.

**15.** The HEW patent regulation found at 45 C.F.R. § 8.2(b) (1980) empowers the Assistant Secretary for Health and Scientific Affairs to determine rights in an invention as follows:
> If he finds that the invention will thereby be more adequately and quickly developed for widest use and that there are satisfactory safeguards against unreasonable royalties and repressive practices, the invention may be assigned to a competent organization for

development and administration for the term of the patent or such lesser period as may be deemed necessary.

This regulation governs HEW patent rights determinations concurrent with 41 C.F.R. § 1–9.107–3(a).  The government argues that § 8.2(b) is inapplicable and is "superceded by the FPRs to the extent inconsistent."  The FPR section cited by the government, 41 C.F.R. § 1–9.100, provides no explicit authority for the latter statement, and we reject the former as sophistry.  An assignment of patent rights is substantially equivalent to the grant of a license, and in fact creates greater rights in the assignee compared with those conveyed to the licensee.  See B. Brunsvold and D. O'Reilly, THE LAW AND BUSINESS OF PATENT AND KNOW-HOW LICENSING B–3 (5th ed. 1981).

**16.** 41 C.F.R. § 1–9.109–6(g)(2) (1980) reads in part:
> [T]he agency may authorize the requesting party to file a patent application on the invention in such foreign country and to retain the entire right, title, and interest therein if it determines such authorization to be in the public interest.....

public will be best served." Moreover, the license agreement executed by Dr. Dickson on June 17, 1977 explicitly stated, "[T]he issuance of such a license has been determined to be in the public interest." In short, the clear language of the determination letter and the license agreement itself indicates that Dr. Dickson was aware of the public interest finding required by the FPR for a waiver of foreign patent rights, and that such a finding was made in compliance with the regulation. Here again, where the language of the contract is clear and complementary to that contained in the regulation, contractual provisions will be given their usual and ordinary meaning. *Timber Access Industries Co.* and *Victory Construction Co., supra.*

The possibility that Dr. Dickson's determination to grant the exclusive domestic license and waiver of foreign rights was erroneous or that the true state of affairs was not as Dr. Dickson believed it to be (as the government alleges) does not standing alone render the contract illegal. The decisions relied upon by the government, *Alabama Rural Fire Ins. Co.* and *Schoenbrod, supra,* were each based upon an unambiguous showing by the government that the purported contracts were illegal. In *Alabama Rural Fire Ins. Co.,* the plaintiff had contracted with the government to provide insurance outside Alabama in violation of the Rural Rehabilitation Corporation Trust Liquidation Act. In granting defendant's motion for summary judgment, this court noted that "the Act's legislative history makes it clear that Congress intended that the assets of state rural rehabilitation corporations were to be used *only* for the benefit of their respective states." 215 Ct.Cl. at 459, 572 F.2d at 736.

The illegality in *Schoenbrod* was even more striking. In *Schoenbrod,* the Department of Interior solicited proposals for processing and selling Alaska sealskins for the account of the United States. The applicable FPR required that procurement be made on a competitive basis and that price comparisons be considered before awarding the contract. The Department of Interior awarded the sealskin contract to a firm selected on non-price grounds, in plain contravention of the FPR. In granting the government's motion for summary judgment, this court concluded, "Where illegality is clear, we have no choice but to hold the award and contract to be invalid." 187 Ct.Cl. at 635, 410 F.2d at 404.

The case now before the court simply does not present a violation of the applicable regulations so clear and substantial as to require the conclusion that the license agreement with AS&E was *plainly illegal.* This proposition is supported by our recent decision in *Trilon Educational Corp. v. United States,* 217 Ct.Cl. 266, 578 F.2d 1356 (1978), where this court refused to declare a manufacturing contract void *ab initio* despite evidence that the contracting officer disregarded an Armed Services Procurement Regulation ("ASPR") requiring him to assemble sufficient information about a prospective contractor to make an educated determination as to the contractor's responsibility. In *Trilon,* the government had cancelled the contract upon discovering that the president of the parent corporation of the firm which had received the award had been convicted for fraud in connection with government contracts. In holding that the *Reiner* standard of plain and palpable illegality was not met, this court stated that "good faith but erroneous responsibility judgments will generally not serve to invalidate a contract award." 217 Ct.Cl. at 274, 578 F.2d at 1360. Similarly, the possibility that Dr. Dickson's good faith determination to grant the exclusive domestic license and waiver of foreign rights to AS&E was erroneous will also not serve to invalidate the license agreement. Although the government presents some evidence which indicates that the decision to award the exclusive three-year license to AS&E may not have been in the best public interest, again, such evidence does not rise to the level of *"plain illegality,"* the threshold test for voiding a contract as enunciated in *Reiner.*[17]

---

17. The Government asserts that three companies other than AS&E—Ohio Nuclear, Inc., EMI

Medical, Inc., and Pfizer Medical Systems—had already invested their capital in developing a

The government attempts to distinguish *Trilon* on the ground that the contracting officer in *Trilon* had broad discretion in making his decision to award a research contract among a number of bidders, whereas in this case discretion is limited by the applicable federal regulations which set forth explicit requirements which must be met before an exclusive domestic license and waiver of foreign rights can be granted. The weakness in this argument is that it imparts an overly narrow interpretation to the regulations in question. The introductory paragraph, found at 41 C.F.R. § 1–9.107–1(a) (1980), reads in part:

> In applying this regulation, agency heads must weigh both the need for incentives to draw forth private initiatives, and the need to promote healthy competition in industry. Consistent with the FPR system, agencies may implement and supplement this subpart.

Such language empowers agency decision-making officials to engage in a balancing process in awarding patent rights and licenses, a discretion limited only to the extent that it is not inconsistent with the FPR system.

In summary, we hold that the decision to grant the exclusive domestic license to AS&E was made in compliance with the "private risk capital" standard and that the waiver of foreign patent rights met the "public interest" standard, both as enunciated in the appropriate FPRs.[18] All other arguments raised by the government, although not directly addressed in this opinion, have been considered and found to be without merit.

Accordingly, after consideration of the submissions of the parties, with oral argument of counsel, defendant's motion for summary judgment is denied, and plaintiff's motion for partial summary judgment on Count I is granted. We award plaintiff judgment on the issue of liability on its Count I and remand the cause to the Trial Division to determine the amount of recovery under Rule 131(c) together with the disposition of Counts II and III.

---

CT Scanner, and would have been forced to shelve their products if the exclusive license had been allowed to run its course. The Government argues that the net effect of this development would have been to deprive "the public of a diversity in approaches toward the implementation of the stationary array design." Even assuming *arguendo* the accuracy of this view, the fact remains that responsible officials in HEW came to a different determination in substantial compliance with the applicable regulations. The mere existence of evidence to support a determination contrary to that which was made does not standing alone constitute evidence of plain illegality. *See Albano Cleaners, Inc. v. United States,* 197 Ct.Cl. 450, 458, 455 F.2d 556, 560–61 (1972).

18. 41 C.F.R. § 1–9.107–3(a) (1980) ("private risk capital" standard); *Id.* § 1–9.109–6(g)(2) ("public interest" standard).