**(1) CITY OF FULTON, (2) City of Lamar, (3) City of Thayer, (4) City of Piggott**

v.

**The UNITED STATES.**

No. 509–80C.

United States Court of Claims.

May 19, 1982.

---

Charles F. Wheatley, Jr., Washington, D. C., attorney of record, for plaintiffs. Wheatley & Wollesen, Washington, D. C., of counsel.

John W. Showalter, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant. Richard Correa, Dept. of Energy, Los Angeles, Cal., of counsel.

Before KASHIWA, KUNZIG,[*] and SMITH, Judges.

ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

SMITH, Judge.

This contract case comes before the court on the parties' cross-motions for summary judgment. Plaintiffs are four cities (Cities) in Missouri and Arkansas which entered into contracts with the Southwestern Power Administration (SWPA) of the Department of the Interior for the purchase of electric power pursuant to section 5 of the Flood Control Act of 1944.[1] In 1979 SWPA announced an interim rate increase which plaintiffs contend violated section 5 of the Flood Control Act and breached their contracts with the Government. The Government, in turn, argues that the interim rate increase was necessary to cover rapidly rising operating costs and was adopted in compliance with federal statutes and the contracts with the Cities. We reject the Governments' position, and consequently, grant plaintiffs' motion for summary judgment and deny defendant's cross-motion for summary judgment. Plaintiffs are awarded judgment on the issue of liability on their breach of contract claims.

I.

In enacting section 5 of the Flood Control Act of 1944, Congress authorized the Secretary of the Interior to transmit and dispose of electric power generated at reservoir projects under the control of the Department of the Army. Section 5 requires that such power be provided "at the lowest possible rates to consumers consistent with sound business principles, the rate schedules to become effective upon confirmation and approval by the Federal Power Commission."[2] For several years the Cities received all or part of their electrical power

---

[*] Judge Robert L. Kunzig participated in the oral argument and agreed to the determination in this case before his death on February 21, 1982.

[1.] 16 U.S.C. § 825s (1976 & Supp. III 1979).

[2.] The full text of section 5 of the Flood Control Act, 16 U.S.C. § 825s (1976 & Supp. III 1979), provides:

"Electric power and energy generated at reservoir projects under the control of the Department of the Army and in the opinion of the Secretary of the Army not required in the operation of such projects shall be delivered to the Secretary of the Interior, who shall transmit and dispose of such power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles, the rate schedules *to become effective upon confirmation and approval by the Federal Power Commission.* Rate schedules shall be drawn having regard to the recovery (upon the basis of the application of such rate schedules to the capacity of the electric facilities of the projects) of the cost of producing and transmitting such electric energy, including the amortization of the capital investment allocated to power over a reasonable period of years. Preference in the sale of such power and energy shall be given to public bodies and cooperatives. The Secretary of the Interior is authorized, from funds to be appropriated by the Congress, to construct or acquire, by purchase or other agreement, only such transmission lines and related facilities as may be necessary in order to make the power and energy generated at said projects available in wholesale quantities for sale on fair and reasonable terms and conditions to facilities owned by the Federal Government, public bodies, cooperatives, and privately owned companies. All moneys received from such sales shall be deposited in the Treasury of the United States as miscellaneous receipts." (Emphasis supplied.)

from the Government, pursuant to contracts entered into between plaintiffs [3] and the SWPA.

In 1977, Congress enacted the Department of Energy Organization Act (DEOA),[4] which abolished the Federal Power Commission (FPC) and transferred the functions of the Secretary of the Interior under the Flood Control Act to the Secretary of Energy.[5] Pursuant to the DEOA, the Secretary of Energy by published order [6] delegated to the Federal Energy Regulatory Commission (FERC) the authority to confirm and approve rates on a final basis which was originally conferred upon the FPC. In the same order the Secretary of Energy also delegated to the Assistant Secretary for Resource Applications [7] the authority to confirm and place in effect on an interim basis rates for electrical power sold by the SWPA. On March 1, 1979, the Assistant Secretary confirmed the rate increase at issue in this case, effective April 1, 1979, on an interim basis, subject to final confirmation by the FERC. Plaintiffs have paid the increased rate since April 1, 1979, and now seek to recover a money judgment from the Government in the amount of the rate increase. Jurisdiction is proper in this court under 28 U.S.C. § 1491 (Supp. III 1979). The central issue in the case before us is whether the interim rate increase authorized by the Assistant Secretary breached plaintiffs' contracts with the SWPA. We conclude that there was such a breach.

## II.

Because the suit before us alleges breach of express contracts between plaintiffs and the SWPA, our inquiry necessarily begins with an analysis of the terms of the contracts. As stipulated by the parties, the relevant portion of the Fulton-SWPA contract pertaining to changes in rates and charges provides:

It is understood and agreed that the rates and/or terms and conditions set forth in the said Rate Schedule "F–1", with the confirmation and approval of the Federal Power Commission, may be increased, decreased, modified, superseded, or supplemented, at any time, and from time to time, and that if so increased, decreased, modified, superseded, or supplemented, the *new rates* and/or terms and conditions *shall thereupon become effective* and applicable to the purchase and sale of Firm Power and Firm Energy under this Contract *in accordance with and on the effective date specified in the order of the Federal Power Commission containing such confirmation and approval.* [Emphasis supplied.]

As stipulated by the parties, the relevant portion of the Lamar-SWPA contract exactly follows the Fulton-SWPA contract. Although worded slightly differently, the Thayer-SWPA and Piggott-SWPA contracts contain language virtually identical to that set forth in the Fulton-SWPA contract quoted above.[8]

3. For purposes of this suit, four contracts between plaintiffs and SWPA are at issue: (1) City of Fulton contract, entered into on April 29, 1977, and effective until May 31, 1987; (2) City of Lamar contract, entered into on April 29, 1977, and effective until May 31, 1987; (3) City of Thayer contract, entered into on April 15, 1963, and effective until June 30, 1983; and (4) City of Piggott contract, entered into on June 21, 1965, and effective until June 30, 1987.

4. 42 U.S.C. §§ 7101–7352 (Supp. III 1979).

5. *See* note entitled "Transfer of Functions" accompanying section 5 of the Flood Control Act, 16 U.S.C. § 825s (Supp. III 1979), which states: "The functions of the Secretary of the Interior under this section were transferred to the Secretary of Energy by section 7152(a)(1) of Title 42, The Public Health and Welfare.

"The Federal Power Commission was terminated and its functions, personnel, property, funds, etc., were transferred to the Secretary of Energy (except for certain functions which were transferred to the Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare."

6. Delegation Order No. 0204–33, 43 Fed.Reg. 60,636 (1978).

7. A later amendment to the original delegation order substituted the Assistant Secretary for Conservation and Renewable Energy for the Assistant Secretary for Resource Applications.

8. The Thayer-SWPA contract stated in part: " * * * It is understood and agreed that the rates set forth in the said Rate Schedule 'F–1'

An examination of each of the four Cities' contracts with the SWPA reveals that each contract provided for periodic rate increases to be effective upon the order of the FPC confirming and approving such increases. However, by the time the interim rate increases now at issue were made effective, the FPC had been abolished by the DEOA. The Government seizes upon the abolition of the FPC and the concurrent transfer of its administrative functions in formulating an ingenious defense to plaintiffs' breach of contract claim.

The Government asserts that a specific provision of the DEOA, appearing at 42 U.S.C. § 7151(b), confers upon the Secretary of Energy the power to perform former *FPC* functions, including rate approval and confirmation under section 5 of the Flood Control Act. 42 U.S.C. § 7151(b) (Supp. III 1979) provides:

> (b) Except as provided in subchapter IV of this chapter, there are transferred to, and vested in, the Secretary the function of the Federal Power Commission, or of the members, officers, or components thereof. The Secretary may exercise any power described in section 7172(a)(2) of this title to the extent the Secretary determines such power to be necessary to the exercise of any function within his jurisdiction pursuant to the preceding sentence.

Specifically, the Government contends (1) that section 7151(b) places the rate-making authority of the former FPC (including an assumed power to effect interim rates) in the Secretary of Energy; (2) that the decision to raise the rates paid by the Cities on an interim basis was a proper exercise of that authority; and (3) that such exercise was a "confirmation and approval" within the meaning of these contracts.

The Government's first contention fails upon a close examination of section 7151(b). Of critical importance is the introductory clause to the subsection, which states, "[e]xcept as provided in subchapter IV of this chapter." Subchapter IV (42 U.S.C. §§ 7171–7177) creates the FERC as an independent regulatory commission within the Department of Energy. Significantly, many of the rate approval functions of the FPC were transferred to the FERC in subchapter IV, such administrative review to be exercised *independently* of the Secretary of Energy. The first sentence of 42 U.S.C. § 7151(b), therefore, does not clearly provide a statutory basis for the Secretary of Energy's claimed authority to adopt an interim rate increase for SWPA customers.

The Government's argument, however, does not fail solely upon an examination of the first sentence in section 7151(b). The second sentence of the subsection provides, "The Secretary may exercise any power described in section 7172(a)(2) of this title to the extent the Secretary determines such power to be necessary to the exercise of any function within his jurisdiction pursuant to the preceding sentence." In essence, the Government contends that section 7172(a)(2) powers encompass interim rate orders under the Flood Control Act. A review of 42 U.S.C. § 7172(a)(2) does reveal references to FERC rate-approval powers under the Federal Power Act and the Natural Gas Act, but *no* reference to similar powers under the Flood Control Act.[9]

---

may, with the confirmation and approval of the Federal Power Commission, be increased, decreased, or superseded, at any time, and from time to time, and that if so increased, decreased or superseded, the new rates shall thereupon become effective and applicable to the sale of Firm Power and associated energy under this Contract in accordance with and on the effective date specified in the order of the Federal Power Commission containing such confirmation and approval."

The parties have stipulated that the relevant portion of the Piggott-SWPA contract pertaining to rate changes is identical to that in the Thayer-SWPA contract.

**9.** 42 U.S.C. § 7172(a)(2) (Supp. III 1979) provides:

"(2) The Commission may exercise any power under the following sections to the extent the Commission determines such power to be necessary to the exercise of any function within the jurisdiction of the Commission:

"(A) sections 4, 301, 302, 306 through 309, and 312 through 316 of the Federal Power Act; and

Thus, section 7151(b) of the DEOA, considered as a whole, does not on its face authorize the Secretary of Energy to effect interim rate increases under the Flood Control Act.[10]

Moreover, the Government's argument that the Secretary of Energy was empowered by the DEOA to implement interim rates under the Flood Control Act ignores an explicit provision of the DEOA, which provides in pertinent part: [11]

> If any provision of any Act, the functions of which are transferred, vested, or delegated pursuant to this chapter, provides administrative procedure requirements in addition to the requirements provided in this subchapter, such additional requirements shall also apply to actions under that provision.

Under section 5 of the Flood Control Act, confirmation and approval of the FPC was required *prior* to the implementation of any rate increase for SWPA customers. This FPC confirmation and approval function constitutes an additional "administrative procedure requirement" which, by the literal terms of section 7191(a)(1), continues to apply to administrative actions under the Flood Control Act. In short, the Secretary of Energy is bound by the administrative procedures set forth in the Flood Control

Act, as was his predecessor, the Secretary of the Interior.

The Government's elaborate argument that the Secretary of Energy was provided with authority to enact interim rate increases under the DEOA also fails to address plaintiffs' central theory of recovery is this case, breach of contract. As the Government concedes, we must enforce a mutually agreed-upon contract according to its terms.[12] The contracts in question state that rates may be increased "with the confirmation and approval of the Federal Power Commission * * * in accordance with and on the effective date specified in the order of the Federal Power Commission containing such confirmation and approval." While this court is not empowered to review the substantive grounds for the rate increase, where rate-making procedures give rise to a breach of contract claim, we must consider whether those procedures were exercised in compliance with the contracts.

In the present case, the terms of the contracts clearly contemplate an increase in rate charges only after "confirmation and approval" by the FPC. No provision for interim increases even exists in the contracts. It is well established in this court that, where the language of a contract is unambiguous, contractual terms will be giv-

---

"(B) sections 8, 9, 13 through 17, 20, and 21 of the Natural Gas Act."

**10.** The Government has cited case authority in support of the general proposition that the FPC was authorized to issue interim rate orders. *See, e.g., F.P.C. v. Tennessee Gas Transmission Co.,* 371 U.S. 145, 150, 83 S.Ct. 211, 214, 9 L.Ed.2d 199 (1962), citing *Federal Power Comm'n v. Natural Gas Pipeline Co.,* 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942), and *New England Divisions Case,* 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605 (1923). Reasoning from these cases, the Government concludes that the Secretary of Energy enjoys a similar authority under the Flood Control Act, to the extent that the Secretary of Energy has assumed the duties of the FPC under the Flood Control Act. Even assuming *arguendo* the latter point, we are unable to agree with the Government's sweeping conclusion regarding interim authority under the Flood Control Act. The cases cited by the Government regard the FPC's authority to issue interim rate orders under the Natural Gas Act, not the Flood Control Act. We also note

that in the principal case cited by the Government, *Tennessee Gas,* the Supreme Court was called upon to consider the authority of the FPC to order an interim rate *reduction,* issued by the FPC pursuant to its duty under the Natural Gas Act to protect consumers from excessive rate charges. Thus, although *Tennessee Gas* upholds FPC authority to issue interim rate orders under the Natural Gas Act, it makes no reference to FPC authority under the Flood Control Act and therefore cannot be viewed as controlling in the case before us.

**11.** 42 U.S.C. § 7191(a)(1) (Supp. III 1979).

**12.** *See California v. United States,* 213 Ct.Cl. 329, 341, 551 F.2d 843, 850, *cert. denied,* 434 U.S. 857, 98 S.Ct. 180, 54 L.Ed.2d 130 (1977); *Eldorado Canyon Resort, Inc. v. United States,* 209 Ct.Cl. 759, 760–61, 538 F.2d 347 (1976) (order); *Broome Constr., Inc. v. United States,* 203 Ct.Cl. 521, 530, 492 F.2d 829, 834 (1974).

en their usual and ordinary meaning.[13] We consider FPC/FERC review to be an important administrative procedure which cannot be cavalierly ignored by the Department of Energy. Moreover, section 5 of the Flood Control Act provided that rate schedules were "to become effective upon confirmation and approval by the Federal Power Commission." The rule that contract terms will be given their ordinary meaning is particularly appropriate where the contract language is easily construed in harmony with the governing statute or regulation.[14] Here, the very language of the statute itself is incorporated into the contract terms. Finally, we are guided by Supreme Court precedent prohibiting unilateral rate increases proposed by utilities in derogation of express contractual terms, otherwise known as the *Mobile-Sierra* doctrine.[15] As applied to this case, the *Mobile-Sierra* doctrine dictates that the express contracts between plaintiffs and the SWPA, which contracts provide procedural safeguards prior to initiation of a rate increase, cannot be unilaterally modified by administrative fiat.

In addition to considering the governing statutes and literal language of the contracts, we are also persuaded by past agency practice in interpreting provisions of the contracts pertaining to rate increases. Plaintiffs contend that since the passage of the Flood Control Act in 1944, and up to passage of the DEOA in 1977, the Secretary of the Interior always sought FPC confir-

mation and approval of rate increases prior to making them effective. In support of this position, plaintiffs cite to the 1957 order of the FPC confirming and approving the "F–1" rate schedule [16] on a final basis. The Government, in turn, responds by pointing out that the F–1 rate schedule was the *only* rate schedule applicable to plaintiffs' contracts during the 1957–79 period; that every other instance referred to by plaintiffs involved nothing more than an extension of existing rates, and that a single example of FPC confirmation and approval of rate *increases* on a final basis does not preclude the FPC's authority to confirm and approve rate increases on an interim basis. Additionally, the Government asserts that the FPC did, in fact, approve interim rate increases under the Flood Control Act in 1947,[17] and has approved interim rate increases three times since 1947.

An examination of the Government's contention regarding the 1947 rate increase, however, reveals that the "interim" rate increase approved by the FPC in 1947 was in fact final approval by the FPC of the first, yet independent, part of a two-part rate increase sought by the SWPA. Thus, in 1947, rates were not first placed into effect on an interim basis subject to a later confirmation, as was the case in 1979.[18] The second [19] and third [20] instances cited by the Government since 1947 were not approvals of interim rate increases sought by

---

**13.** *American Science & Eng'g, Inc. v. United States,* 228 Ct.Cl. ——, ——, 663 F.2d 82, 88 (1981); *S. W. Aircraft Inc. v. United States,* 213 Ct.Cl. 206, 212, 551 F.2d 1208, 1212 (1977); *Hotpoint Co. v. United States,* 127 Ct.Cl. 402, 406, 117 F.Supp. 572, 574, *cert. denied,* 348 U.S. 820, 75 S.Ct. 32, 99 L.Ed. 647 (1954).

**14.** *See, e.g., American Science & Eng'g, Inc. v. United States,* 228 Ct.Cl. at ——, 663 F.2d at 88; *Timber Access Indus. Co. v. United States,* 213 Ct.Cl. 648, 658, 553 F.2d 1250, 1256 (1977); *Victory Constr. Co. v. United States,* 206 Ct.Cl. 274, 287, 510 F.2d 1379, 1386 (1975).

**15.** *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956) (*Mobile*); *F.P.C. v. Sierra Pac. Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956) (*Sierra*).

**16.** Rate schedule F–1 was established in 1957 and made applicable to all firm power customers of the SWPA's system. As of May 1981, the SWPA was selling power to 55 customers (including plaintiffs) in a 6-state region consisting of Arkansas, Kansas, Louisiana, Missouri, Oklahoma, and Texas.

**17.** F.P.C. Docket No. IT–5971 (Feb. 13, 1947).

**18.** This court was advised by the parties at oral argument that the FERC has only recently approved the interim rate increase affecting the SWPA customers at issue in this case.

**19.** F.P.C. Docket No. E–8978, 54 F.P.C. 808 (1975).

**20.** F.P.C. Docket No. E–9563, 42 Fed.Reg. 31,-492 (1977).

the SWPA under the Flood Control Act, but rather were interim rate increases sought by the Bonneville Power Administration under a separate statute, the Bonneville Project Act.[21]

Finally, we turn to the fourth instance cited by the Government in which the FPC allegedly approved a rate increase pursuant to the Flood Control Act on an interim basis. A review of the record confirms the Government's contention that in 1975 the FPC, pursuant to the Flood Control Act, did approve rate schedules of the Southeastern Power Administration (SEPA) on an interim basis.[22] However, the record also reflects that the Department of the Interior strongly opposed this action by the FPC, as indicated in a letter of July 11, 1975, from the Assistant Secretary to the Chairman of the FPC which stated in part:

We respectfully suggest that significant aspects of the Commission's action were without statutory authority and arbitrary. Under the Flood Control Act, the Commission's authority is limited to either confirming and approving the rates established by the Secretary or disapproving them; it does not have the authority to fix substitute rates, as it does for regulated utilities under the Federal Power Act. It follows from this that the Commission does not have authority to make its confirmation and approval conditional upon the outcome of further proceedings or upon the agreement by SEPA to make refunds or credits if the Commission changes its mind. * * *

In addition to this strong opposition to the very exercise of power at issue here, voiced by the Department of the Interior itself, the 1975 interim rate increase can be further distinguished from the rate increase now at issue. First, the 1975 FPC action

was in regards to a rate increase sought by the South*eastern* Power Authority, not by the SWPA, which serves a separate group of customers and may involve contracts with different terms. The 1975 action was also apparently effected in the absence of *contractual* terms requiring FPC approval on a final basis, in stark contrast to the 1979 interim increase involved here.

■ In summary, our review of the history of administrative practice under the Flood Control Act, considered as a whole, does not support the Government's view of FPC rate confirmation and approval. Significantly, we are unable to discover a single instance in the period 1944–77 in which the FPC, pursuant to the Flood Control Act, approved on an *interim* basis a rate increase sought by the SWPA. Moreover, it was clearly the practice of the Secretary of the Interior, consistent with contractual requirements, to seek final confirmation and approval of rates by the FPC before making them effective. Accordingly, we find the actions of the Assistant Secretary of Energy in authorizing an interim rate increase prior to final approval of the FERC not supported by previous administrative practice in applying section 5 of the Flood Control Act. Although the interpretation given a statute by the agency charged with its administration is entitled to considerable deference,[23] where authority in the original statute (Flood Control Act) is claimed as the basis for a departure from past administrative practice, the agency's interpretation is subject to rigorous judicial review.[24]

In closing, we note that our resolution of the breach of contract claim now before us is further assisted by persuasive precedent established in a federal district court opinion disposing of very similar issues. In

**21.** 16 U.S.C. §§ 832–832*l*, 838–838k (1976 & Supp. III 1979).

**22.** F.P.C. Docket No. E–7002, 54 F.P.C. 3 (1975).

**23.** *See, e.g., Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Selman v. United States,* 204 Ct.Cl. 675, 681, 498 F.2d 1354, 1357 (1974).

**24.** *See, e.g., NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 289, 94 S.Ct. 1757, 1769, 40 L.Ed.2d 134 (1974); *F.P.C. v. Panhandle Eastern Pipe Line Co.,* 337 U.S. 498, 513–14, 69 S.Ct. 1251, 1260, 93 L.Ed. 1499 (1949). Although the substantive rate increase is not before us, when the increase impinges on contractual rights, we are empowered to review past administrative practice in evaluating the breach of contract claim.

*United States v. Tex-La Electric Coopera-tive, Inc.,*[25] the Government brought suit against Tex-La, a SWPA customer, for failing to pay the interim rates prior to final confirmation and approval by the FERC. The two contracts at issue in *Tex-La* both required that any rate increase be " 'in accordance with and on the effective date specified in the final order of the FPC containing such confirmation and approval.' "[26] In granting Tex-La summary judgment, the court concluded that "[t]he Section 5 [Flood Control Act] confirmation and approval function, incorporated into the contracts at hand, cannot be unilaterally abrogated."[27] We adopt a similar rationale in concluding that the Government breached its contract with plaintiffs in the case at bar.[28]

In summary, we hold that the rate increase ordered by the Assistant Secretary of Energy on an interim basis violated that provision of the contracts between plaintiffs and the Government which required "confirmation and approval" by the Federal Power Commission. All other arguments raised by the Government, although not directly addressed in this opinion, have been considered and found to be without merit.

Accordingly, after consideration of the submissions of the parties, and after hearing oral argument, defendant's cross-motion for summary judgment is denied, and plaintiffs' motion for summary judgment is granted. We award plaintiffs judgment on the issue of liability and remand the cause

to the trial division to determine the amount of recovery under Rule 131(c).

is authorized to implement interim rate increases pursuant to section 5 of the Flood Control Act, and that such interim increases do not constitute a breach of contract. *See Pacific Power & Light Co. v. Duncan,* 499 F.Supp. 672 (D.Or.1980); *Colorado River Energy Distrib. Ass'n v. Lewis,* 516 F.Supp. 926 (D.D.C.1981); and *Montana Power Co. v. Edwards,* No. 80–842PA (D.Or. May 10, 1981). In *Pacific Power* and *Montana Power,* decided by the same judge, there is virtually no discussion of the breach of contract issue which forms the basis of plaintiffs' complaint in the case before us, and thus the cases lack significant precedential value. *Colorado River* did not involve the Flood Control Act, was not a breach of contract case, and is therefore similarly inapposite.

---

25. *United States v. Tex-La Elec. Coop., Inc.,* 524 F.Supp. 409 (E.D.La.), *appeal docketed,* No. 81–3715 (5th Cir. Nov. 20, 1981).

26. *Id.* at 414.

27. *Id.* at 421.

28. A second court has recently adopted the "careful analysis" employed by the *Tex-La* court. *See United States v. Northeast Texas Elec. Coop.,* No. H–81–604 (S.D.Tex. Dec. 9, 1981), *appeal docketed,* No. 82–2014 (5th Cir. Jan. 13, 1982). *See also Arkansas Power & Light Co. v. Schlesinger,* No. 79–1263 (D.D.C. Oct. 20, 1980), *appeal dismissed,* No. 80–2573 (D.C.Cir. Jan. 26, 1981). The Government has cited three federal district court cases as precedent for the view that the Secretary of Energy