CITY OF KENAI, Appellant,

v.

George FILLER, A.I.A., Appellee.

No. 2685.

Supreme Court of Alaska.

July 22, 1977.

---

Karl L. Walter, Jr., Groh, Benkert & Walter, Anchorage, for appellant.

Robert B. Baker, Robertson, Monagle, Eastaugh & Bradley, Anchorage, for appellee.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

BURKE, Justice.

This dispute arises out of a contract for architectural services entered into between the appellant City of Kenai and appellee George Filler. Both parties agree that a contract was entered into relating to the development of a civic center. The City's first major argument on appeal is that the trial court erred in finding that the parties amended the original contract to increase the proposed cost and scope of the Kenai Civic Center and thus increase the size of Filler's architectural fee under the payment terms of the original contract. Its second contention is that the trial court erroneously found that the evidence showed that the City had ratified the amended Filler contract and was obligated to pay Filler for the authorized increase in project scope.

On June 2, 1971, by Resolution No. 71–25, the Kenai City Council gave their City Manager, Edwin H. Glotfelty, authority to hire Filler as architect for the design of a Kenai Civic Center. Under this resolution, no specific limit was placed on the size of the proposed Civic Center Project.

On June 16, 1971, the City entered into a contract with Filler to provide architectural services relating to the development of this civic center. This agreement was reduced to written form by American Institute of Architects Document B–131, "Standard Form of Agreement between Owner and Architect." This agreement, signed by City Manager Edwin H. Glotfelty and Filler, provided that the total project cost would not exceed $1.6 million and that the architect's fee for the services described in paragraph 1.1 of the contract would be computed as 8% of the "construction costs." Paragraph 3.1.2 of the contract defined construction cost for a project which is not constructed as the "lowest bona fide bid received for any and all of such work." Under the contract provisions, payment of 80% of the architect's fee for the services specified in paragraph 1.1 was due if the project entered the bidding or negotiation phase.

Paragraph 1.2 provided that certain additional services, if authorized by the City, would be performed at additional cost. Such additional services included "providing special analysis of the owner's needs and programming the requirements of the project"; providing financial feasibility or other special studies"; and hiring "special consultants."

Prior to entering into the contract, Filler did not review the City Charter, the City ordinances, except for building regulations, or resolutions authorizing any contracts for architectural services. He appears to have relied solely on the City Manager in Kenai.

In early March of 1972, Filler submitted a schematic design for the Kenai Civic Center to the Kenai City Council. On March 23, 1972, Filler appeared at a public hearing in Kenai. At that meeting, the public indicated dissatisfaction with the limited scope of the planned project. The City Manager and others then mentioned the possibility of obtaining additional money to permit the City to increase the scope of the project to a $2.4 million civic center. Filler apparently was asked to develop two plans. The first plan was within the original project cost of $1.6 million. The second and more elaborate plan was based on a project cost of $2.4 million.

On May 3, 1972, Filler appeared before the Kenai City Council and presented two

schematic drawings and two cost estimates. Scheme I was for a civic center project costing approximately $1.6 million; Scheme II provided for a more extensive civic center project costing approximately $2.4 million. On the evening of May 4, 1972, Filler appeared before a public hearing in Kenai to present both Scheme I and Scheme II to the City Council and the public. After these meetings, Filler testified that he was left with the impression that the City Council had approved the larger $2.4 million scheme. Consequently, Filler requested a confirmation from the City Manager in the form of a letter indicating that the City wished to go ahead with the larger project. This request was made because of prior problems with the City concerning the payments for increased cost on a previous project. Glotfelty sent Filler the following letter dated June 29, 1972,

> You are requested to proceed with the drawings of May, 1972 of the Kenai Civic Center, scheme number two, sheet numbers one and two.
>
> In your Standard Architect Agreement dated June 16, 1971, the City of Kenai specified that the total projected costs was not to exceed $1,600,000.00. We would like this amended to a total projected cost not to exceed $2,400,000.00.

City Manager Glotfelty testified that before he wrote the letter the City Council had approved the amendment at either a regular or special meeting of the council. Thus, he apparently felt he had the authority to amend the original contract. However, Glotfelty also testified that he intended after the letter of June 29th to have a written amendment added to the original contract.

After receiving the June 29th letter, Filler commenced his design and development drawings for the $2.4 million project. However, it should be noted that Filler admitted that the language "we would like this amended" was not a specific contract amendment but that he interpreted the entire letter as an amendment to the contract.

On September 6, 1972, Filler appeared before the Kenai City Council and present-ed to them design and development drawings for a $2.4 million project. According to Glotfelty's testimony, the Council instructed him to proceed with the completion of the Scheme II design drawings and specifications and to put the project out to bid.

On October 4, 1972, the Council approved partial payment to Filler based upon a billing for a $2.1 million project, Filler's then current estimate of the total Scheme II project cost. Filler objected by telephone to the City Manager that this payment was insufficient; the City Manager indicated, according to Filler's testimony, that Filler would receive full payment. The City Manager testified that he made partial payment to Filler only because he wanted to speed Filler's process of producing final plans and specifications for Scheme II even though the partial payment is based on a computation of 8% of the $1.6 million project cost of Scheme I.

The project was advertised for bids during the period from the end of October through early November in numerous newspapers of general circulation. All advertisements for bids indicated a project of approximately 37,000 square feet as outlined in Scheme II, the $2.4 million scheme. Five copies of the final plans and specifications (Scheme II) were sent to the City on November 5, 1972. These plans and specifications were apparently used by the City to obtain bids for construction of the Civic Center. In November, Filler also presented the City with the architect's final estimate showing an estimated total construction cost of $2,372,000.

On December 11, 1972, bids for the Civic Center project were opened. The low bid for the project without the alternative, optional features was $1,876,000. The lowest bid with all eleven alternatives was $2,417,-000. At the December 20, 1972 Kenai City Council meeting, the City Manager stated to the City Council that the low bid with the first four alternatives was $2,108,000. The Council voted to attempt to proceed with construction and to ask the two low bidders to keep their bids open for a period of sixty (60) days. At the same meeting,

the Council apparently approved payment of a partial fee to Filler based upon an estimated construction cost of $2,100,000. It should be noted that the fee payment is listed in the Council minutes as "Notification of Payment," and no formal Council action with respect to it is shown.

As of December 11, 1972, the City in its official financial records computed payments to Filler for the Civic Center on the basis of Scheme II cost estimates. Anticipated funding for the Kenai Civic Center did not materialize. Accordingly, the Council passed a resolution on April 18, 1973 rejecting the low bids submitted on the Civic Center.

The minutes of the City Council during all of 1972 and 1973 are silent as to any formal agenda item, approval, or action by the Council as to any amendment or changes in the original architectural contract.

Filler, on May 6, 1974, filed a complaint in the superior court alleging that the City of Kenai had failed to pay him $36,505.15, the balance of his architectural fees due him under the allegedly modified contract. Filler contended that his fee should have been computed on the basis of the Scheme II costs of $2.4 million. The City of Kenai countered that no contract modification took place and hence any payment must be based on the Scheme I cost of $1.6 million.

The City also counter claimed for alleged fee overpayments made to Filler based on $2.4 million costs.

The lower court held that the City Council had approved amendment of the contract and alternatively held that the Council had ratified the modified contract.

This appeal followed.

■ The City urges several claims of error on this appeal.[1] It urges that the lower court erred in finding a contract amendment and erred in finding ratification of the contract amendment without specific findings of fact. Given that our affirmance of the lower court on the ratification issue is dispositive of this controversy we find it unnecessary to reach the City's contention that it did not specifically approve the contract amendment according to its City Charter and Ordinances.

■ The City contends that the trial court failed to enter findings of fact and conclusions of law in order to allow the Supreme Court a basis for review on the issue of ratification.[2] Such a position however, fails upon a reading of the trial court's written decision.[3] In his decision, Judge Buckalew states after enumerating his findings of fact and conclusions of law:

In summary, the Court finds that the City Manager did have express authority

---

1. The City's point that Filler failed to plead ratification falls in the face of Alaska Rule of Civil Procedure 8(f) which states:

All pleadings shall be construed so as to do substantial justice.

Thus, as Professor Wright states with respect to Federal Rule of Civil Procedure 8(f) the model on which our state rule is patterned:

. . . all the Rule requires is 'a short and plain statement of the claim' that will give fair notice of what the plaintiffs claim is and the grounds upon which it rest. (Wright, Law of Federal Courts p. 285 (2nd ed. 1970)) Filler's complaint gives fair notice of his claim. See Record on Appeal 1-2.

2. In *Common Wealth Insurance Systems, Inc. v. Kersten*, 40 Cal.App.3d 1014, 115 Cal.Rptr. 653, 661 (1974) ratification was defined as

. . . 'the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if

originally authorized by him'; ratification may be by conduct which is inconsistent with any reasonable contention on his part other than that he intended approving and adopting the act. (*Rakestraw v. Rodrigues*, supra, 8 Cal.3d 67, 73, 104 Cal.Rptr. 57, 60, 500 P.2d 1401, 1404.) Voluntary retention of benefits with knowledge of the unauthorized nature of the act constitutes ratification. (*Fidelity & Casualty Co. v. Abraham*, 70 Cal.App.2d 776, 782-783, 161 P.2d 689; 1 Witkin, Summary of Cal. Law (8th ed.) Agency and Employment, § 129, p. 736; Rest.2d Agency, §§ 98, 99.) Acquiescence or silence may also constitute ratification. (*Ralphs v. Hensler*, 97 Cal. 296, 303, 32 P. 243; *Waldteufel v. Sailor*, 62 Cal.App.2d 577, 581, 144 P.2d 894. See *Bank of America v. Perry*, 41 Cal.App.2d 133, 141, 106 P.2d 53; Rest.2d Agency, supra, § 94.)

3. Record on Appeal 110-12.

and did amend plaintiff's contract. This court further finds that the facts would also warrant a recovery for the plaintiff under a theory of ratification.

The trial court's statement thus appears to incorporate the same findings of fact and conclusions of law utilized for finding of a contract amendment [4] and thus meets the requirements of *Moores v. Alaska Metal Buildings, Inc.*, 448 P.2d 581, 582–83 (Alaska 1968) where this court stated:

> . . . [a] trial judge [has] the duty under Civil Rule 52(a) to make sufficiently detailed and explicit findings of fact in order to afford this court a clear understanding of the basis for his decision.

An unenumerated summary of Judge Buckalew's findings shows that:

— Filler was requested to prepare two design schemes.

— The City through its agent requested Filler to prepare design drawings based on the larger of two Civic Center schemes, i. e., the $2.4 million design.

— Filler presented these design drawings before the Kenai City Council on September 6, 1972, with the Council on October 4, 1972, approving partial payment to Filler based upon a $2.1 million figure.

— The City took advantage of the large scope design in its bid advertisements which were published in the latter part of October, 1972, which indicated a project based on the $2.4 million figure.

— The City Council after bids were opened was advised by the City Manager that total project cost was between $2.35 million and $2.5 million. With this knowledge the Council voted to proceed with construction.

We conclude that the lower court's findings of fact and conclusion of the law sufficiently detailed and explicit as to meet the *Moores, supra,* standard and therefore find

that they meet the requirements of Civil Rule 52(a).

■ The City also urges that any ratification of an amended contract must be by acts as formal as those necessary for a valid contract in the first instance. However, such a result would place a premium on technical requirement and ignore actual circumstances. McQuillan states:

> The ratification of a contract by the municipal corporation may be made by the affirmative action of the proper officials or by any action or non-action which in the circumstances amounts to an approval of the contract. To constitute due ratification of an executory contract the general rule is that there must be formal corporate action. But it does not necessarily follow that lack of an affirmative act will exempt the city from liability where the contract has been executed by the other party thereto. The city may be bound by inaction.[5]

In the case at bar, Filler fully performed his part of the contract in preparing a design plan based on specification changes ordered by the City Manager. Even though the City Council was aware that it was working with a design plan which was of increased scope over the plan initially contracted for, it made no effort to indicate that it disapproved of the City Manager's order to Filler to increase the size of the project.

■ The City also ventures the argument that one dealing with an agent of a municipal corporation does so at his own risk and is required to be aware of any limitations on the agent's authority. It contends that this court adopted this proposition in *King v. Alaska State Housing Authority*, 512 P.2d 887 (Alaska 1973). We recognize that then Chief Justice Rabinowitz stated that

> . . . it is well established that all persons dealing with a public corporation are deemed to know its limitations.[6]

However, this statement must be read in the context of the cases cited in support of the proposition offered. The supporting

---

4. *Id.*

5. McQuillan, *Municipal Corporations* § 29.106, 520–521 (3rd ed. 1966).

6. 515 P.2d at 891.

authorities are based on fact patterns where the alleged contract was illegal *ab initio* due to a lack of power on the part of the public agency to enter into the contract.

In *King, supra* the court relied on *Dyson et al. v. Dixon et al.*, 219 Ga. 427, 134 S.E.2d 1, 2 (Ga.1963) wherein the appellants argued they had a right to certain property sold by a public redevelopment corporation on the basis that the development corporation's agent had promised them a preference. The Georgia court held that since the redevelopment corporation itself could grant no preference neither could its agent.

The second authority relied on by *King, supra, State ex rel. Bain v. Clallam County Bd. of Com'rs*, 77 Wash.2d 542, 463 P.2d 617 (1970), concerned a union which urged the court to grant a writ of mandamus to force the County Board to honor an oral collective bargaining agreement for a pay increase. Such an increase would have required a transfer between budget accounts. In upholding the right of the Board not to perform the court stated:

> The commissioners gave as one reason for declining to perform the tentative oral agreement that their official counsel, the Prosecuting Attorney of Clallam County, had advised them that it would be illegal to grant the pay increase because no emergency existed warranting a departure from the 1968 budget. We are not concerned with and do not pass on whether this court would ultimately sustain the prosecuting attorney's position, but rather whether the commissioners had a legal right to heed his advice. The record and the findings support the Commissioners on this point.[7]

The third authority cited by the *King* court, McQuillan on *Municipal Corporations*, § 29.04 at 220–23, qualifies his assertion at § 29.104 at 506 by stating that "contracts which are within the scope of the corporate powers but not authorized by proper action of the municipal corporation . . . may be ratified by the proper corporate authorities." The City urges, citing McQuillan at 527, that "ratification can be made only by an observance of the same formalities and provisions to be complied with in the making of a valid contract."

However, this authority cites *Los Angeles Dredging Co. v. City of Long Beach*, 210 Cal. 348, 291 P. 839 (1930), a case which also requires only prior legal authority to contract and does not stand for the broader proposition that a contract only becomes effective upon formal compliance rather than functional compliance with statutory requirements to a valid contract.

■ The City thus urges this Court to release them from their contractual obligation since they did not follow the black letter of their own ordinances which require a ratification to be set on it's Council's agenda and a formal yea-nay vote taken. The record shows that the City knew of the enlarged scope of the project, directed its City Manager to let the bid on the enlarged Scheme II project, partially paid Filler's fee based on a $2.1 million project and then, when they could not find sufficient funding, attempted to disavow any approval of the enlarged project. Given that the City also accepted the benefits of the enlarged project by asking bids while utilizing Filler's plans, the trial court was not clearly in error in finding a ratification of the contract.

■ The City raises as an additional basis of appeal the contention that the lower court erred in requiring the City to pay Filler $5,500 for a feasibility study and to reimburse Filler for the cost of special consultants. These assertions are, however, without merit. In both situations the City Manager requested the services rendered and the City accepted the benefits.

■ As a final attack, the City lists seven grounds on which it argues the lower court erred in improperly weighing the evidence. Summarized, the City's seven assertions of error are that the lower court erred in finding:

1. That Filler was asked to develop two design plans;

2. That the City Manager sent Filler a letter stating the total project cost was amended to a figure not to exceed $2.4 million;

3. That Filler was notified that the City Council approved the final specifications and that the project would be put out to bid;

---

7. 463 P.2d at 619.

4. That the City Council on October 4, 1972, approved partial payment to Filler based upon a $2.1 million cost;

5. That on December 20, 1972, the City Council authorized payment of a fee to Filler based on a $2.1 million cost;

6. That the low bidder on the civic center project based his bid on Filler's final estimate; and

7. That the City Council voted to proceed with construction.

The standard for review of findings of fact was set out by this court in *Alaska Placer Co. v. Lee*, 553 P.2d 54, 59 (Alaska 1976):

This court will not set aside a finding of fact of a trial judge unless it is clearly erroneous. A finding is clearly erroneous when, although there may be evidence to support it, we are left with a definite and firm conviction on the entire record that a mistake has been made. We must also give due regard to the trial court's opportunity to judge the credibility of the witnesses. (citations omitted)

We are unconvinced that the lower court erred with respect to the seven grounds of error asserted by the City. In fact, the lower court's findings of fact are more than substantiated by the evidence at trial.

AFFIRMED.