EARTHMOVERS OF FAIRBANKS,
INC., Appellant,

v.

STATE of Alaska, DEPARTMENT OF
TRANSPORTATION AND PUBLIC
FACILITIES, Appellee.

No. S–2307.

Supreme Court of Alaska.

Dec. 16, 1988.

Rehearing Denied Jan. 18, 1989.

Joseph L. Paskvan, Hoppner & Paskvan,
P.C., Fairbanks, for appellant.

Linda L. Walton, E. John Athens, Jr.,
Asst. Attys. Gen., Fairbanks, and Grace
Berg Schaible, Atty. Gen., Juneau, for appellee.

Before MATTHEWS, C.J., and
RABINOWITZ, BURKE, COMPTON
and MOORE, JJ.

## OPINION

PER CURIAM.

The memorandum decision and order of
the superior court is set forth in the appendix. We disagree only with the superior
court's conclusion that Earthmovers
waived its right to mobilization costs incurred between April 27th and May 1 because it failed to submit documentation to
the contracting officer within thirty days
as requested. It appears that Earthmovers
did submit documentation to the state within thirty days of the request. Such documents were attached to its administrative
appeal dated June 24, 1985. In our view,
this is sufficient compliance with the thirty
day submission requirement. We reverse
and remand on this point with instructions
to the superior court to remand the case to
the agency for computation of the costs in
question. In all other respects the decision
of the superior court is affirmed.

AFFIRMED IN PART AND REVERSED IN PART.

## APPENDIX

IN THE SUPERIOR COURT FOR THE
STATE OF ALASKA FOURTH
JUDICIAL DISTRICT

Earthmovers of Fairbanks, Inc., Plaintiff,

vs.

State of Alaska, Department of
Transportation and Public
Facilities, Defendant.

Case No. 4FA–86–195 Civil

Filed June 26, 1987

MEMORANDUM DECISION
AND ORDER

This is an appeal from a decision of the
appeals officer of the Department of Trans-

portation and Public Facilities (DOTPF). He denied recovery to Earthmovers of Fairbanks (EM) on a contract awarded to it on April 27, 1984 and cancelled on May 25. He ruled that the contract was illegal because it was awarded in violation of Standard Specification 102–1.06 and AS 35.15.-050.

The issue before the court is the enforceability of the April 27 contract. To resolve a dispute such as this, the court must analyze the legal relationship between the parties, a question which this court is at least as capable of deciding as an administrative agency. Therefore, the court may substitute its judgment for that of the agency.[1] *See Kelly v. Zamarello,* 486 P.2d 906, 916 (Alaska 1971).

In February 1984, the DOTPF issued an invitation for bids for construction of the Nome–Council Road. Bidders were instructed to express the prices in their bids in both words and numerals and that in the event of a discrepancy between the prices written in words and those written in figures, the prices written in words would govern. This requirement is part of Section 102–1.06 of the agency's Standard Specifications.

EM and Alaska International Construction (AIC) submitted bids in response to the invitation. When the bids were opened, EM was the apparent low bidder. However, there was a discrepancy in AIC's bid between a price written in words and that written in figures. When the agency applied Standard Specification 102–1.06, AIC was the lowest responsible bidder. DOTPF announced its intent to award the contract to AIC. EM protested the decision within the agency; when those protests were unsuccessful, EM sued in the superior court for an injunction. The superior court granted EM's motion for summary judgment on April 26, 1984, permanently enjoining the award to AIC.

Prior to the superior court decision, the parties had agreed that the contract would be awarded on April 27 in accord with the superior court's decision. The State reserved the right to cancel the award; all parties reserved their appellate rights.

AIC appealed the superior court's decision and applied to the supreme court for a stay of proceedings on the lower court judgment. The stay was denied and the contract was awarded to EM the afternoon of April 27. On April 30, the supreme court reversed itself and granted the stay. On May 1, DOTPF notified EM to cease all actions related to the project and said it would take no responsibility for actions taken during the time the stay was in effect. Also on May 1, DOTPF appealed the superior court ruling and joined in AIC's request that the court review the decision on an expedited basis. That request was granted.

On May 23, the supreme court reversed the superior court and directed that EM's suit be dismissed. On May 25, DOTPF sent EM a notice that the contract was terminated effective that date.

On July 13, the superior court entered an order based on a stipulation agreed to by AIC, EM and DOTPF. EM agreed to the State's termination of its contract and reserved its rights to out of pocket expenses incurred after the award. It agreed to submit the claim through the normal administrative procedure provided by the Standard Specifications.

On August 2, 1984, EM submitted a claim for $287,625.54. EM asserted that the claim was in accord with Article 108–1.-09 of the Standard Specifications. That article prescribes recovery when a contract is terminated for the convenience of the department. It provides that:

> independent judgment on the record, and since EM concedes that the record is sufficient for the court to make a decision without benefit of an additional hearing, the court holds that a trial de novo is not required by due process, nor necessary under the court's discretionary powers.

---

1. EM asserts that it is entitled to a trial de novo because the procedure afforded it under the Standard Specifications did not comport with due process. However, EM also says that the court could decide this dispute on the written record now before it as a motion for summary judgment. Since this appeal presents only questions of law and the court will exercise its

108–1.09. *Termination of Work for Department's Convenience.* The performance of the work under the contract may be terminated by the Department in accordance with this section in whole or in part, whenever, for any reason the Contracting Officer shall determine that such termination is in the best interest of the Department. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination, specifying termination is for the convenience of the Department, the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.

After receipt of a Notice of Termination, the Contractor shall submit to the Contracting Officer, within 90 days of the effective date, his claim for additional damages or costs not covered above or elsewhere in these specifications. Such claim may include such cost items as reasonable idle equipment time, mobilization efforts, bidding and project investigative costs, overhead expenses directly allocable to the project termination and not covered under work paid for at agreed unit prices of contract bid prices, legal and accounting charges and other expenses reasonably necessary in claim preparation, subcontractor costs not in advance of termination date, guaranteed payments for private land usage as part of the original contract, and any other cost or damage items for which the Contractor feels reimbursement should be made. The intent of negotiating this claim would be an equitable settlement figure to be reached with the Contractor. In no event, however, will loss of anticipated profits be considered as part of any settlement.

EM claimed:

A. $258,297.67 for equipment standby costs calculated the the Blue Book rental rate; [2]

B. $11,671.99 for mobilization costs;

C. $9,476.00 for bidding expenses; and

D. $8,179.88 for overhead and accounting related to mobilization and claim preparation.

On April 5, 1985, the contracting officer responded that the termination was not made pursuant to Standard Specification 108–1.09. Rather, DOTPF viewed the award as illegal and void because the supreme court reversed the superior court. The award to EM violated Standard Specification 102–1.06 (providing for interpretation of numbers in the bid) and AS 35.15.-050, which provides:

The department shall award the contract to the lowest responsible bidder, or it may reject all bids. If no satisfactory bid is received, the department may readvertise the project. The department shall make the award in compliance with applicable federal law and the regulations promulgated under it, with this title, and in compliance with AS 37.05, and the rules and regulations promulgated under it, where they are not in conflict with this title and federal law.

DOTPF expressed its willingness to consider properly documented mobilization costs incurred between the award on April 27 and the May 1 notice of suspension. It requested that EM submit certified payrolls for all wages, plane tickets and subsistence receipts. The same notice set forth EM's appeal rights. EM declined to submit the documentation but did appeal the contracting officer's decision to the appeals officer. The appeals officer upheld the contracting officer's decision and also ruled that because EM had not submitted the requested documentation in support of mobilization costs, EM had waived the right to recover those costs. This appeal followed.

1. *Effect of the Supreme Court Decision*

The State's contention that this award did not create a binding bargain is based on the Supreme Court's decision in *Alaska International Construction, Inc. v. Earth Movers,* 697 P.2d 626 (Alaska 1985). Thus,

---

**2.** Standard Specification 109–1.05(3) specifies that for extra or force account work, the contractor will be compensated for actual use of equipment or standby use according to formulas utilizing the Blue Book Rental Rate.

it is necessary to consider the scope and effect of that decision. In *AIC*, the court did not specifically address the propriety of the April 27 award to EM. As a general rule, a judgment of reversal is not necessarily an adjudication by the appellate court of any question other than those which were discussed and decided. 5 Am. Jur.2d, *Appeal and Error*, § 955 at 382. EM argues for a strict reading of the Supreme Court's decision. In EM's view, the holding was unrelated to the validity of EM's contract: the fact that the agency had correctly determined AIC to be the lowest responsible bidder did not mean that EM's contract was illegal. EM thus concludes that the State's cancellation was a mistake, the contract was validly awarded, and EM should recover under the contract's termination for convenience clause.

The State contends that the Supreme Court's decision necessarily implied that the award to EM violated AS 35.15.050 and Standard Specification 102–1.06. The State argues that a contract made in violation of a statute and regulation is illegal and void; EM should recover nothing.

It is true, as EM says, that the Supreme Court did not direct DOTPF to cancel EM's contract and award to AIC. The question before the court was the propriety of the agency's decision to award to AIC. The court said that DOTPF did not abuse its discretion when it decided AIC's bid error was not material and when it applied Standard Specification 102–1.06 to correct the bid. The question discussed and decided was AIC's status as the lowest responsible bidder. Since as a general rule, only one bidder can occupy that position, it is not unreasonable to infer that EM was not the lowest responsible bidder. Arguably, then, the award to EM violated AS 35.15.050.

One thing the supreme court clearly did do is reverse the superior court. The supreme court stated that the superior court had enjoined the award to anyone other than EM. However, the superior court

specifically rejected that language at the April 26 hearing and in its May 3 order. The superior court enjoined the award to AIC; it did not direct that the award be made to EM. EM's position seems to be that since the superior court did not require the State to award to EM, the injunction had nothing to do with that award and neither did the reversal.

Normally, the effect of a reversal is that a judgment is vacated and the case is put back in the same position in which it was before judgment. *See Shilts v. Young*, 643 P.2d 686, 688 (Alaska 1982). As a general rule

> A judgment rendered by a court having jurisdiction of the parties and the subject matter protects the parties acting under it before reversal or stay and constitutes a sufficient justification for all acts done in its enforcement before it is reversed or set aside by competent authority.... However, proceedings taken under the judgment are dependent for their validity on the judgment being sustained. When it is reversed or set aside, the party to the record who has received the benefit thereof must make restitution to the other party of money or property received under it.

5 Am.Jur.2d, *Appeal and Error*, § 997, at 424.[3]

It has been said that the rights of parties to an action pending an appeal are well-settled:

> A party to a suit is presumed to know of all the errors in the record and such a party cannot acquire any rights or interests based on such an erroneous decree that will not be abrogated by a subsequent reversal thereof. If such a party has received benefits from the erroneous decree or judgment, he must, after reversal, make restitution, and, if he has sold property erroneously adjudged to belong to him, he must account to the true owner for value. Titles acquired by parties

---

**3.** There is one exception to this general rule. Where a court of last resort overrules itself, the decision will not be held retroactive so as to impair the obligations of contracts entered into in reliance on the earlier decision. This exception applies only where the reliance was placed in a decision of the court of last resort and not in a decision of an inferior court. 21 C.J.S., *Courts* § 194, at 329–330.

to the record under an erroneous judgment or decree will be divested by the subsequent reversal of such decree or judgment. (citations omitted) A party to a decree cannot acquire any rights thereunder while the same is subject to review which he can assert after the decree is reversed, since the effect of the reversal is to abrogate the decree and leave thet (*sic*) cause as it stood prior to the entry of the decree.

*Goshen County Co–Op Beet Ass'n v. Pearson,* 706 P.2d 1121, 1124 (Wyo.1985), *quoting Willett Company v. Carpentier,* [4 Ill.2d 407,] 123 N.E.2d 308, 311 (Ill.1954).

As to most litigants, when they acquire a benefit based on an erroneous decree, a reversal divests them of that benefit. Thus, had EM acquired property rights as a result of the superior court's error, it would have had to give up those rights. EM would argue that it acquired no rights under the superior court's order. It is true that rights do not arise under a public contract until a bid is accepted. *See Beirne v. Alaska State Housing Authority,* 454 P.2d 262, 264 (Alaska 1969). But the plain effect of the superior court's decision was that if the agency were to award on April 27, it must award to EM.[4] To contend that the court's action had nothing to do with the award and did not benefit EM is to ignore the facts. It is clear that the contract and the rights arising under it were benefits EM acquired as a direct or indirect result of the superior court's order. Thus, the reversal itself abrogated the award and destroyed any rights EM acquired under the contract. However, even if the contract itself survived the reversal, EM became the lowest responsible bidder under the superior court order. The reversal at a minimum changed that effect. Therefore the award to EM violated AS 35.15.050.

The question then is the effect of that violation. The court must decide what remedy is appropriate for a contractor who is awarded a public contract which turns out to violate a statute or regulation. Both federal and state courts have considered that question and the decisions are useful in analyzing the question.

### 1. *The Federal Remedy*

Both parties have relied exclusively on federal decisions concerning cancelled public contracts. State courts often turn to decisions of the federal Court of Claims and the federal boards of contract appeals for guidance in public contract law. *See New Pueblo Constructors, Inc. v. State,* [144 Ariz. 95,] 696 P.2d 185, 191 (Ariz. 1985). Federal cases are regarded as persuasive, rather than controlling. *Id.*

Traditionally, a contractor whose federal contract was cancelled as invalid could recover only if the government acquired some benefit under the contract. He recovered, not on the contract but under a contract implied at law; the rationale being:

[O]rdinary principles of equity and justice preclude the United States from retaining the services, materials, and benefits and at the same time refusing to pay for them on the ground that the contracting officer's promise was unauthorized or unenforceable for some reason. However, the basic fact of legal significance charging the government with in these situations is its retention of benefits in the form of goods and services.

*Prestex, Inc. v. United States,* [162 Ct.Cl. 620,] 320 F.2d 367, 373 (Ct.Cl.1963).

The contracting officer has only that authority actually conferred upon him by statute and regulation. If he exceeds his actual authority, the government is not estopped from denying the limitations on his authority. Even though the contractor relied on the contracting officer's apparent authority, he was charged with notice of all statutory and regulatory limitations. *Id.* 320 F.2d at 371.

In 1963 the Court of Claims provided for a new remedy.[5] In *John Reiner & Co. v.*

---

**4.** Standard Specification 103–1.02 requires an award to be made within 40 days after bid opening. The State says the award was made on April 27 to comply with that requirement.

**5.** In part, this remedy was adopted to deal with

*United States,* [163 Ct.Cl. 381,] 325 F.2d 438 (Ct.Cl.1963) and a companion case, *Brown & Son Electric Co. v. United States,* [163 Ct.Cl. 465,] 325 F.2d 446 (Ct.Cl. 1963), the court awarded termination for convenience recovery to contractors whose contracts with the government were cancelled. In *Reiner* the court recognized that, in certain situations, equity required more than quantum meruit recovery. The contract awarded in *Reiner* was cancelled when a dissatisfied bidder protested the awards to the Comptroller General. The contractor, unaware of the protest until he received a notice to suspend work, had incurred limited expenses in reliance on the award. *Reiner,* 325 F.2d at 439.

The Comptroller General oversees government procurement practices and, until *Reiner,* he would advise the agency to cancel contracts for technical imperfections in the invitation or winning bid. The court was concerned with the innocent contractor who was neither aware of nor the cause of the illegality in the award. *See United States v. Amdahl Corp.,* 786 F.2d 387, 393 (Fed.Cir.1986). "Procurement officers must find themselves through a maze of statutes and regulations which bidders know little about. It would be unfair for them to suffer for every deviation." *Trilon Educational Corporation v. United States,* [217 Ct.Cl. 266] 578 F.2d 1356, 1360 (Ct.Cl.1978). The *Reiner* court noted that "because of (the Comptroller General's) general concern with the proper operation of competitive bidding in government procurement, he can make recommendations and render decisions that, as a matter of procurement policy, awards on contracts should be cancelled or withdrawn even though they would not be held invalid in court." *Reiner,* 325 F.2d at 440. The court went on to explain:

> In testing the enforceability of an award made by the Government, where a problem of the validity of the invitation or the responsiveness of the accepted bid arises after the award, the court should ordi-

narily impose the binding stamp of nullity only when the illegality is plain. If the contracting officer has viewed the award as lawful, and it is reasonable to take that position under the legislation and regulations, the court should normally follow suit. Any other course could place the contractor in an unfortunate dilemma. If he questions the award and refuses to accept it because of his own doubts as to the possible illegality, the contracting officer could forfeit his bid bond for refusing to enter into the contract. The full risk of an adverse decision on validity would then rest on the bidder. If he accedes to the contracting officer and commences performance of the contract, a subsequent holding of non-enforceability would lead to denial of all recovery under the agreement even though the issue of legality is very close; and under the doctrine of quantum meruit there would be no reimbursement for expenses incurred in good faith but only for any tangible benefits actually received by the defendant. (citations omitted) It is therefore just to the contractor, as well as to the Government, to give him the benefit of reasonable doubts and to uphold the award unless its invalidity is clear.

*Id.* Thus, when the contracting officer exercised his discretion to make an award, and his decision was reasonable, that decision would be upheld. The court held that the agency made a mistake when it cancelled Reiner's contract. Nevertheless, it could have terminated the contract for convenience since deference to the Comptroller General was an adequate reason for convenience termination. 325 F.2d at 442. Though the contractor's award was "deemed" valid, he could not recover common law damages for breach of contract. *Id.* at 443–444. He was limited to the remedy permitted by the convenience termination clause: expenses incurred in good faith prior to receipt of notice of suspension. *Id.* at 444.

the effects of a decision granting standing to dissatisfied bidders to sue to enforce compliance with procurement laws and regulations. *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d

859 (D.C.Cir.1970). *See* T. Brous, Termination for Convenience: A Remedy for the Erroneous Award, 5 Public Contract L.J. 221, 232 (1972).

In essence, *Reiner* was an attempt to impress on an intermediate forum a particular standard of review.

There was an implied threat in the holdings of the court in this area. Clearly, the court placed the Comptroller General on notice that if the latter persisted in canceling erroneous awards, not palpably illegal in the court's opinion, then the canceled contractor would be allowed to recover termination for convenience damages in a suit brought to the Court of Claims.

T. Brous, *supra,* at 225. The *Reiner* remedy arose in the context of internal disputes between different levels of the contract administration bureaucracy. It bolstered the authority of the agency to make its own decisions unimpeded by protesting bidders and interference from the General Accounting Office. So long as the flaw in the invitation or bid did not impair the purpose of the competitive bidding system—full and free competition—and so long as he made the award in the reasonable exercise of his discretion, the contracting officer's decision would be upheld. *Reiner,* 325 F.2d at 442. It was, after all, the government which made the mistake in entering the contract in violation of the procurement groundrules. T. Brous, *supra,* at 231. The contractor who did not contribute to the mistaken award was an innocent party and should not be required to bear the costs of the error. *See United States v. Amdahl Corp.,* 786 F.2d 387, 395.

After *Reiner,* the court was faced with defining the "plain illegality" which it had said would warrant outright cancellation and quantum meruit recovery. The following standard has emerged: a cancelled contractor will be limited to recovery for benefit conferred

(1) if the award was made contrary to statutory or regulatory requirements because of some action or statement of the contractor (*Prestex, Inc. v. United States,* [162 Ct.Cl. 620,] 320 F.2d 367 (Ct.Cl.1963)), or

(2) if the contractor was on direct notice that the procedures being followed were violative of such requirements (*Schoenbrod v. United States,* [187 Ct.Cl. 627,] 410 F.2d 400 (Ct.Cl.1969)).

*See United States v. Amdahl Corp.,* 786 F.2d at 395. *Prestex* and *Schoenbrod* were cases where the violations of procurement regulations were gross. In *Prestex,* the contractor "invited the illegal award" by submitting a nonconforming and misleading sample in support of his bid. *Prestex,* 320 F.2d at 374. The nonconformity was not apparent until tests were performed subsequent to the award. His bid was in actuality nonresponsive. *Id.* at 373. In *Schoenbrod,* the agency made the award without discussing price with all the bidders. Price, the court said, was a major factor in evaluating bids. *Schoenbrod,* 410 F.2d at 403. If the contractor was unaware of the departure from regular procurement practice, he should have been aware.

The State contends that EM meets both prongs of the above test: EM was awarded this contract because it persuaded the superior court to enjoin the award to AIC; EM was on notice that the award violated Standard Specification 102–1.06 and AS 35.15.-050. EM responds that it should not be penalized for challenging the bid evaluation process in court and in any event, the court did not direct the State to award to EM. EM cites *Prestex* and *Schoenbrod* for the proposition that federal courts limit quantum meruit recovery to situations involving fraud, misrepresentation or bad faith.[6] The Court of Claims has not so limited itself: "An unambiguous showing that a purported contract is impermissible will prevent an enforceable agreement from arising." *Alabama Rural Fire Ins. Co. v. United States,* [215 Ct.Cl. 442,] 572 F.2d 727, 733 (Ct.Cl.1978).

EM relies on *Levinson v. United States,* [258 U.S. 198, 42 S.Ct. 275,] 66 L.Ed. 563 (U.S.1922), a case which treatise writers have construed to stand for the proposition

---

**6.** EM overstates its case. In cases of actual fraud, even quantum meruit recovery may be denied. *See K & R Engineering Co. v. United*

*States,* [222 Ct.Cl. 340,] 616 F.2d 469 (Ct.Cl. 1980).

that, absent fraud or bad faith, the contracting officer's erroneous acceptance of a bid creates a valid contract binding on the government. *See* 1B McBride & Wachtel, *Government Contracts*, § 10.10[6], at 10–30 (1987). Those same treatise writers concede that *Levinson* has not been widely followed. It is not cited in the Court of Claims decisions. In a decision upholding an agency's cancellation of a contract, the Comptroller General distinguished *Levinson* on the grounds that it did not involve a "procurement (which was) subject to the statutory requirement that award be made to the lowest responsive and responsible bidder." 50 Comp.Gen. 447, 455 (1970).[7] Furthermore, the *Levinson* court, in rejecting the government's argument that it was entitled to rescission because of the mistake, said "There was no mistake that Levinson had anything to do with." *Levinson,* [258 U.S. at 202, 42 S.Ct. at 276,] 66 L.Ed. at 565. EM cannot plausibly argue that it had nothing to do with this mistaken award.

The Court of Claims has never been called on to consider a case such as that at bar. This is not a case where a problem with the invitation or bid arose after the contract was awarded. Here a contractor initiated a protest, received an award in the midst of the protest as a result of a lower court decision, lost the protest on the merits in the court of last resort, and is now attempting to enforce that contract. There is, however, one federal case which implies that if an award is cancelled as the result of court action, even a contractor who ultimately prevails in the protest would not be awarded termination for convenience recovery. In *Allen M. Campbell v. United States,* 467 F.2d 931 (1972), the agency made an award to Campbell which was subsequently cancelled when a disappointed bidder protested the award in a federal district court. The district court held that Campbell was not a small business for purposes of this small business set-aside contract. The court did not direct

the agency to cancel Campbell's award or to award to the protester. Nevertheless, the agency did both. The district court decision was reversed on appeal by the Court of Appeals. The Court of Claims awarded Campbell termination for convenience damages because his valid award had been cancelled. The court implied that had the district court expressly limited the agency's discretion, the initial validity of Campbell's award might not mandate termination for convenience recovery:

> We emphasize that this case does not involve a situation where a dissatisfied bidder has persuaded a court to direct the procuring agency either to award the contract or to cancel an award to another one. In those circumstances the result might be different but we intimate no opinion on that question at this time.

*Id.* at 934.

Here, EM's contract was not cancelled as a result of an erroneous lower court decision. However, it was awarded as a result of such a decision. The court's position in *Campbell* is logical and is relevant to the case at bar. The starting point in *Reiner* was an award which was made in the exercise of discretion. Where a court order is entered precluding an agency from making an award to a particular bidder, the agency's discretion is vitiated. If the agency wishes to proceed with the project, the undisputed purpose of contracts such as this, it can only award in accord with the lower court's decision. In effect, the agency is deprived of its decision making power by the court.

EM contends that because the agency had other options it could have pursued, this award was made in the exercise of the agency's discretion. EM points to the following factors in support of its argument. DOTPF determined, prior to the superior court's issuing a permanent injunction, to award in accord with the superior court decision. On April 26, after the hearing in the superior court, the agency announced

---

**7.** *Levinson* involved the sale of a yacht by the Secretary of the Navy. The sale was made under a statute which empowered the President to direct a departure from the prescribed manner of sale and his direction to the Secretary of the Navy to sell "for such price as he shall approve." 50 Comp.Gen. at 455.

that, absent a court order to the contrary, it would award the contract to EM on the 27th. The agency did not initially seek a stay in the supreme court nor file a notice of appeal. When AIC's application for emergency stay was initially denied by the Supreme Court, the agency proceeded with the award to EM. It did not exercise its reserved right pursuant to Standard Specification 103–1.03 to cancel the award prior to execution, but rather decided to make the award in accord with Standard Specification 103–1.02, which requires award within 40 days of bid opening.

The *Reiner* remedy was created to apply to those situations where the contracting officer in his sole discretion, unrestricted except by applicable statutes and regulations, determined the identity of the lowest responsible bidder and accepted that bid. It was not intended to apply in a situation such as that at bar. The record shows that DOTPF accepted EM's bid because further delay would jeopardize the timely completion of the project and increase its cost. For similar reasons, the agency determined that it would be contrary to the public interest to reject all bids and resolicit, since the bids were well below the engineer's estimate. There are no allegations that DOTPF acted unreasonably or in bad faith in making those determinations. None of the options EM cites permitted the agency to proceed with the project on April 27 unless it awarded the contract to EM. In order to comply with Standard Specification 103–1.02 and believing that further delay would be detrimental to the public interest, DOTPF made the award on April 27. Under the superior court's order, an award to AIC would have put the agency in contempt of court. The award to EM was the only possible option if the project was to proceed expeditiously.

Under these circumstances, it appears that the Court of Claims would not award a party in EM's position termination for convenience recovery. The court would hold that, in light of the Supreme Court decision, the agency's cancellation was not a mistake. This bid was not accepted in the exercise of the agency's discretion, nor is EM like the contractor in *Reiner*, who did not contribute to the erroneous award. Thus, under federal authority, EM's recovery would be limited to benefit conferred on the State.

## 2. The Enforceability of Public Contracts in State Courts (The Ultra Vires Doctrine)

State courts have analyzed the enforceability of public contracts under the "ultra vires" doctrine. A contract is said to be ultra vires when it is wholly beyond the scope of the public agency's authority under any circumstances and for any purpose. *See* 10 McQuillin, *Municipal Corporations* § 29.10, at 236 (3d ed. 1981). Where contracts are let in a manner which contravenes the purpose of competitive bidding, courts have declared them to be void and illegal ab initio. For example, in *Platt Electric Supply v. City of Seattle*, [16 Wash.App. 265,] 555 P.2d 421, 431 (Wash. App.1976), a contract was awarded to a bidder after the contracting officer privately negotiated with him to lower his bid. The court held that the award was void. Similarly, when a contract which by statute required competitive bidding was let without seeking bids, the contract was void. *Martin v. City of Corning*, [25 Cal.App.3d 165] 101 Cal.Rptr. 678, 680 (Cal.App.1972). However, a contractor who performs under such a void contract may be permitted to recover in quantum meruit. *See, e.g., Edwards v. City of Renton*, [67 Wash.2d 598,] 409 P.2d 153, 159 (Wash.1965). *See also* 33 A.L.R.3d 1164 (1970). Similarly, where an agency has the general authority to award such a contract, but the award is technically or procedurally flawed such that it violates a statute, a contractor will be permitted quantum meruit recovery so long as the award is not marked by fraud or bad faith and does not manifestly contravene public policy. *Noel v. Cole*, [98 Wash.2d 375,] 655 P.2d 245, 250 (Wash.1982). "A private party acting in good faith may recover to the extent necessary to prevent manifest injustice or unjust enrichment." *Id.* He may recover the reasonable value of his performance.

The purpose of the ultra vires doctrine is to protect the citizens and taxpayers from unjust, ill-considered or extortionate contracts, or those showing favoritism.[8] 10 McQuillin, *Municipal Corporations* § 29.02, at 200 (3d ed. 1981). The rationale for the rule is the protection of those unsuspecting individuals whom the entity represents. *Chemical Bank v. Wash. Public Power Supply System,* [99 Wash.2d 772,] 666 P.2d 329, 342 (Wash.1983).

The ultra vires doctrine has been applied by the Alaska Supreme Court in a competitive bidding situation in *King v. Alaska State Housing Authority,* 512 P.2d 887 (Alaska 1973). King was a developer whose competitive proposal to purchase and redevelop land for an urban renewal project was unsuccessful. He had formerly owned property in the project area. By statute, the Housing Authority had the power to grant preference rights to bids of former owners under certain conditions. King argued that the agency was estopped from denying his entitlement to an absolute preference right because he had invested funds in reliance on the representations of an ASHA agent. The agent had told King about the preference rights, but did not advise him of their contingent nature. The court said that the agency could not be bound by its agent's representations because the agency itself had no power to grant absolute preference rights. A public corporation could not bind itself to a contract which was beyond the scope of its powers. 512 P.2d at 891 n. 11. Despite King's reliance on the agent's word, he could be charged with knowledge of the statutory constraints of the agency's authority. "It is well established that all persons dealing with a public corporation are deemed to know its limitations." *Id.* at 891.

Though the agency in *King* had the power to grant a preference, its authority to do so was conditioned on compliance with statutes and regulations. In the instant case, the agency has statutory authority to award contracts such as that at bar. AS 35.05.040(10) provides that the department directly may procure materials and contractual services for planning, design and construction of public facilities of the state. It could be argued that that power is conditioned on strict compliance with AS 35.15.050 and the Standard Specifications. As between equally responsive and responsible bidders, the agency has no discretion or power to accept other than the lowest bid. The language of the statute is mandatory and the court has said that the agency is required by law to award to the lowest responsible bidder. *See Chris Berg, Inc. v. State,* 680 P.2d 93, 94 (Alaska 1984). Moreover, a bidder whose offer is accepted can fairly be held to be aware that the validity of his award is contingent on his status as lowest responsible bidder.

However, as noted above, many state courts find a contract void only where an agency completely lacks the authority to make the bargain or where the defect in the award seriously impairs the purpose of the competitive bidding statutes. Even then, some measure of quantum meruit recovery may be permitted.

Alaska cases since *King* suggest that the supreme court would adopt a similar approach. In *City of Kenai v. Filler,* 566 P.2d 670 (Alaska 1977), the city attempted to avoid payment for work done and accepted under an amendment to an architect's contract. The city argued that the amendment was unenforceable because it had not been formally approved according to the procedures mandated by ordinance. *Id.* at 676. Despite the fact that the city had used Filler's work in advertising for bids, the city, citing *King,* contended that Filler had assumed the risk that the amendment was unauthorized. The court found that the amendment was within the scope of the city's powers and by accepting the benefits

---

**8.** The purpose of the ultra vires rule is remarkably similar to that ascribed to AS 35.15.050. Its manifest purpose is to protect the public from contracts let without competitive bidding, or through corruption or favoritism. 1959 Op. Atty.Gen. at 3. That purpose is achieved by strict compliance with carefully drawn public competitive bidding standards. *See AIC v. EM,* 697 P.2d at 631.

of the work performed, the city had ratified the contract. *Id.*

An agency could be estopped from denying the validity of a contract where its agent acted in an "irregular" fashion, technically or procedurally. Where a contract was truly ultra vires, because the agency lacked the power to enter it, no estoppel could be raised. *See Municipality of Anchorage v. Schneider,* 685 P.2d 94, 96 n. 3 (Alaska 1984). The court has most often applied this estoppel analysis in the context of violations of zoning ordinances. In *Schneider,* the court considered the traditional rule that a person dealing with a municipality is bound to take notice of the legal limits of its powers and those of its agents. *Id.* at 96. When the traditional rule was applied, the zoning authority was not estopped from denying the validity of a building permit issued in violation of its zoning ordinances. The court said the traditional rule often produced unfair results:

> The average citizen simply cannot know the extent of authority of every public official with which he must deal and it is outrageous to deny him justice when he has been mislead to his detriment by the acts and statements of public officials within the contours of their responsibilities.

685 P.2d at 96, *quoting* 2 C. Antieau, *Municipal Corporation Law* § 16A.05 at 16A–12 (1984). The court noted that the traditional rule precluding an estoppel was

> founded on the policy that a municipality acts for the good of its citizens rather than a narrow proprietary interest. Thus, the argument goes, it would be unjust to the public to enforce estoppel against a municipality.

685 P.2d at 97. The court went on to say that "While we recognize the general validity of this policy, we believe it can be adequately served within the doctrine of estoppel." *Id.*[9]

Arguably EM is not in the same position as an average citizen who is unaware of the limits on a public entity's authority. It is undisputed, however, that EM acted in good faith when it challenged the bid evaluation in court and when it executed the contract. Therefore, it is necessary to consider whether the facts of this case give rise to an equitable estoppel and, if so, to what extent.

In order to raise an equitable estoppel against a public agency, four factors must be considered. The first three factors are present here.[10] The fourth factor requires this court to determine to what extent an estoppel may be asserted in this case. An estoppel will be enforced against a public entity only to the extent that justice requires. *Schneider,* 685 P.2d at 97 (Alaska 1984).

> Often, even where reliance has been foreseeable, reasonable, and substantial, the interest of justice may not be served by the application of estoppel because the public interest would be significantly prejudiced.

*Id.*

The public interest is implicated in this case in two ways. The primary purpose of AS 35.15.050 is to protect the public purse. The statute has been said to have a secondary purpose, *viz.,* to accord public contractors a certain amount of fair play. 1959 Op.Atty.Gen. at 3. The supreme court has recognized that treating contractors honestly and fairly serves the public interest. *See King v. Alaska State Housing Au-*

---

**9.** The court has applied the same analysis in a case involving an agency's denial of an application for a limited entry permit. *Grunert v. State.,* Op. No. 3169, [735 P.2d 118, 122] at 11 (Alaska, April 3, 1987).

**10.** Those three factors are:
(1) the assertion of a position by conduct or word; [This factor requires a positive act by the agency clearly authorizing EM to take the steps that it did. *See Jackson v. Kenai Peninsula Borough,* [733 P.2d 1038, 1040] Op. No. 3163, at 9 (Alaska, March 6, 1987). This re-

quirement is met by DOTPF's actions on April 27 when it executed the award and issued a notice to proceed.]
(2) reasonable reliance on that assertion; [EM's reliance on the binding nature of its bargain was reasonable, at least until the time the Supreme Court issued the stay and DOTPF notified EM to suspend all operations under the award.] and
(3) resulting prejudice. [EM says it incurred expenses in preparing to perform.]

*thority*, 633 P.2d 256, 262 (Alaska 1981). The court then must balance these two policies to reach a fair result. This is not a case like *Filler* where a public entity accepted the benefits of work performed and then tried to avoid paying for them. On those facts, justice required that the contract be enforced. If the court adopts the remedy of quantum meruit, as other state courts have utilized, EM would recover nothing, since it conferred no benefit on the state. Under these circumstances, it would be fair to both the public and to EM to reimburse EM for its actual out of pocket expenditures made in reasonable reliance on the April 27 award. This result comports with the reasonable expectations of the parties as reflected in a stipulation entered into after the Supreme Court decision. In that stipulation, all parties gave up their rights to attorney's fees and costs. EM agreed to the termination of its contract and

> reserve(d) such rights as it ha(d), to be reimbursed by the State for its out of pocket expenses after the award of the contract to it. This claim (would) be made to the State by the normal administrative process as provided by the Standard Specifications.

The court concludes that actual costs incurred after the Supreme Court entered its stay on May 1 and EM received the notice to suspend work were not made in reasonable reliance on the validity of the award.

The court notes that the bulk of EM's claim—$258,297.67—is for equipment standby time. It would be unfair to the public to require the agency to bear these costs. When a contractor resorts to the courts to challenge a bid award, the inevitable result is delay. In the case at bar all parties were paralyzed as a result of EM's protest. It is reasonable to infer that the State and AIC too were compelled to absorb the costs which such delay entails. Others' equipment and labor forces stood idle awaiting the final outcome of EM's protest. Under these circumstances, it is only fair that EM rather than the public should bear a share of the costs attributable to the delay.

This court holds that EM is entitled only to reimbursement for its out of pocket expenditures made between April 27 and May 1, when EM received the notice of suspension of work. Those costs would have been incurred as a result of EM's mobilization activities. The court notes that the agency expressed its willingness to consider payment of EM's actual mobilization costs on April 25, 1985. In accord with the parties' agreement that the claim for those costs would be submitted pursuant to the Standard Specifications, the agency asked EM to submit documentation in support of the claim.[11] EM declined to do so, choosing instead to pursue a remedy in this court. EM contends that it would have been fruitless to submit the required documents because the agency also determined on April 25 that the contract was illegal. The court finds that EM's argument is without merit; submittal of the documentation would not have prejudiced EM's right to pursue this appeal.

The court concludes that EM was entitled to its mobilization costs as a matter of equity because the public interest is served when contractors are treated fairly. But fair treatment also requires that all contractors who are similarly situated be treated equally. If this court were to ignore EM's refusal to submit supporting documentation for its claim, it would be granting EM an advantage that other contractors with claims are denied. Accordingly, although this court holds that EM, as a matter of equity, was entitled to reimbursement for its out of pocket costs, the court holds that EM waived that claim.

In summary, the court holds:

1. The agency was not mistaken when it cancelled EM's award because EM was

---

11. Standard Specification 105–1.16 provides:

The Contracting Officer reserves the right to make written request to the Contractor at any time for additional information which the Contractor may possess to support the claim.

The Contractor agrees to provide the Contracting Officer such additional information within 30 days of receipt for such request ... Failure to furnish such additional information constitutes a waiver of the claim.

not the lowest responsible bidder as required under AS 35.15.050.

2. EM is not entitled to recover termination for convenience damages under the contract.

3. In the interests of fairness, EM was entitled to recover its actual out of pocket mobilization costs incurred in reasonable reliance on the April 27 award. Costs incurred after May 1, when EM received the notice of suspension, were not reasonably expended.

4. EM agreed to submit its claim pursuant to the Standard Specifications. Specification 105–1.16 permits the contracting officer to request documentation in support of a claim. Although EM was asked to submit such documentation, it refused to do so. Accordingly, EM waived its right to recover its mobilization costs.

Based on the foregoing,

The decision of the DOTPF appeals officer is AFFIRMED.

DATED at Fairbanks, Alaska this 26th day of June, 1987.

/s/ Mary E. Greene
MARY E. GREENE
Superior Court Judge